Elrem ISLAMI, Petitioner,

v.

Alberto GONZALES, United States Attorney General, Bureau of Citizenship and Immigration Services, Respondent.

Docket No. 03-40095.

United States Court of Appeals, Second Circuit.

Argued: May 26, 2005.

Decided: June 23, 2005.

Harry A. DeMell, New York City, for petitioner.

Stephen R. Cerutti, II, Assistant U.S. Attorney, for Thomas A. Marino, U.S. Attorney for the Middle District of Pennsylvania, Harrisburg, PA, for respondent.

Before: CALABRESI, KATZMANN, and PARKER, Circuit Judges.

CALABRESI, Circuit Judge.

Elrem Islami ("Islami"), a former resident of Kosovo, and a citizen of Yugoslavia,[1] came to the United States on December 17, 1999 and, on May 17, 2000, petitioned for asylum and withholding of removal, under the Immigration and Na-

tionality Act of 1952, as well as for protection under Article 3 of the U.N. Convention Against Torture ("CAT").

I.

In his application, Islami alleged that as a Muslim and ethnic Albanian residing in Kosovo, he had been persecuted by ethnic Serbs who dominated the Yugoslavian government and military. Islami escaped from Kosovo in February 1998 largely to avoid being conscripted into the Yugoslavian military, a fate he says he tried to resist (1) because of his concerns that the ethnic Serbs physically abused their Albanian counterparts and, more importantly for our analysis, (2) because he feared that he would be ordered to participate in unlawful and brutal Serb-led military campaigns, which were widely condemned internationally. (In this respect, he notes that these alleged brutalities were directed especially at his fellow Muslims and ethnic Albanians.)

Islami first sought asylum in Germany in 1998, but was denied protection and ordered to return to Kosovo. He then fled to the United States in December 1999 (where much of his immediate family had sought refuge),[2] and applied for asylum.

On February 20, 2002, an Immigration Judge ("IJ") denied his petition. The IJ found that even if Islami's claims of harassment and mistreatment were true, the actions committed against him did not

1. Islami was born a citizen of the Federal People's Republic of Yugoslavia. By the time of the alleged incidents, the Yugoslavia into which he had been born had broken into various independent countries. After the independence of Slovenia, Croatia, Bosnia, and Macedonia, Serbia and Montenegro, along with Kosovo, Islami's home province, remained a part of the legacy Yugoslav nation. Since 2003, this legacy nation has been renamed and reconstituted as Serbia–Montenegro. And, Kosovo, although technically included in Serbia–Montenegro, now has the status of an international protectorate. For convenience, we will still refer to Islami's home country as Yugoslavia.

2. Because no one else in Islami's household was of draftable age, they did not leave Kosovo with the urgency that the petitioner did. Consequently, they traveled to the United States some time after Islami escaped to Germany, and all thirteen were granted asylum here.

rise to the level of persecution. Moreover, the IJ held that Islami's fears of future persecution were not well-founded in light of improved conditions in Kosovo (particularly given the installation of a new government in Belgrade) since Islami's departure.

This decision was summarily affirmed on May 28, 2003, by the Board of Immigration Appeals ("BIA"). Islami filed the instant petition for review in this court.

He argues that the IJ erred as a matter of law in concluding that, because compulsory military service is not a bona fide ground for claiming persecution, Islami was not eligible for asylum. Islami explains that he was not avoiding military service per se, but rather that he was objecting to being forced to take part in military activities that were widely condemned by the international community as

criminal. He also resisted service because he feared physical abuse by ethnic Serbs who occupied dominant positions in the military.

Additionally, Islami contends that the conditions in Kosovo have not improved as dramatically as the IJ concluded. Islami claims that notwithstanding the NATO invasion and occupation, incidents of persecution of ethnic Albanians persist to this day.

## II.

To establish eligibility for asylum, an applicant must show that he or she is a refugee who has suffered past persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or has a well-founded fear of persecution on one of these grounds.[3] *See* 8 U.S.C. § 1101(a)(42); *Jin*

---

**3.** Although the text of 8 U.S.C. § 1101(a)(42), read literally, states that a petitioner establishes his or her eligibility for a grant of asylum based on a showing of either past persecution *or* a well-founded fear of future persecution, the BIA has indicated that demonstrating past persecution, on its own, does not guarantee a favorable exercise of discretion on the part of the Attorney General in granting asylum. *See Matter of Chen*, 20 I. & N. Dec. 16 (BIA 1989). In *Matter of Chen*, the BIA held:

> If an alien establishes that he has been persecuted in the past ... he is eligible for a grant of asylum. The likelihood of present or future persecution then becomes relevant as to the exercise of discretion, and asylum may be denied as a matter of discretion if there is little likelihood of present persecution.

*Id.* at 18.

Following suit, though we routinely invoke the *disjunctive* statutory framework in presenting the law of this circuit, *see, e.g., Jin Shui Qiu v. Ashcroft*, 329 F.3d 140, 148 (2d Cir.2003); *Secaida–Rosales v. INS*, 331 F.3d 297, 306 (2d Cir.2003); *Diallo v. INS*, 232 F.3d 279, 284 (2d Cir.2000), we actually apply a more exacting standard.

That is, our cases are to be read as holding that proving past persecution is the first of two hurdies that an alien must meet to merit a "favorable exercise of discretion." *Matter of Chen*, 20 I. & N. Dec. at 19. That showing of past abuse creates a rebuttable presumption of future persecution, which can be defeated if the Government demonstrates that conditions in the country of origin have changed sufficiently, so that the danger no longer exists. If that presumption is defeated at this second stage of the analysis, the BIA, except in circumstances rising to "atrocious forms of [past] persecution," may deny a request for asylum. *Id.; see also Tian–Yong Chen v. INS*, 359 F.3d 121, 126–27 (2d Cir. 2004) (noting that if an applicant has established past persecution, he or she is presumed to have a well-founded fear of future persecution which *may be rebutted* by a showing of changed country conditions); *Secaida–Rosales*, 331 F.3d at 306 (indicating that, upon a demonstration of past persecution, a presumption of future persecution may be rebutted by a showing that conditions in the country of origin have changed to the degree that the danger no longer exists); *Jin Shui Qiu*, 329 F.3d at 148 ("A showing of past persecution sets up a rebuttable presumption of a well-founded fear of future persecution,

*Shui Qiu v. Ashcroft,* 329 F.3d 140, 148 (2d Cir.2003). To be entitled to withholding of removal, the applicant must meet the requirements of asylum eligibility *and* establish that it is more likely than not that were he or she to be deported his or her life or freedom would be threatened on account of one of the five bases for asylum. *See Diallo,* 232 F.3d at 284–85. "It is easier to establish eligibility for asylum, but the power to grant asylum to eligible aliens is discretionary, and reserved to the Attorney General. By contrast, the Attorney General must withhold the deportation of an alien who passes the stricter test for this form of relief." *Jin Shui Qiu,* 329 F.3d at 148 (internal citations omitted).[4]

Article 3 of the CAT provides that "[n]o State Party shall expel [or] return . . . a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted* Dec. 10, 1984, art. III, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85, *codified* at 8 U.S.C. § 1231 and *implemented* at 8 C.F.R. § 208.16. We have defined torture "as the intentional infliction of pain or suffering that is perpetrated or sanctioned by a nation's authorities." *Ramsameachire v. Ashcroft,* 357 F.3d 169, 184 (2d Cir.2004); *see also* 8 C.F.R. § 208.18(a)(1) (defining torture, for purposes of the CAT, in equivalent terms); *Mu–Xing Wang v. Ashcroft,* 320 F.3d 130,

134 (2d Cir.2003) (referring to definition of torture in 8 C.F.R. § 208.18(a)(1)).

■ To qualify under the CAT, an alien must establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal," *Ramsameachire,* 357 F.3d at 184 (internal quotation marks omitted). The regulations provide that

> [i]n assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:
>
> (i) Evidence of past torture inflicted upon the applicant;
>
> (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;
>
> (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and
>
> (iv) Other relevant information regarding the conditions in the country of removal.

8 C.F.R. § 208.16(c)(3).

Once an alien has met this burden, the United States may not remove him or her to that country. *See Ramsameachire,* 357 F.3d at 184; *see also Mu–Xing Wang,* 320 F.3d at 144 n. 20 ("To be entitled to relief

---

which is overcome only if 'a preponderance of the evidence establishes that a change in circumstances in the applicant's country of nationality has occurred such that the applicant's fear is no longer well-founded.' " (quoting *Guan Shan Liao v. DOJ,* 293 F.3d 61, 67 (2d Cir.2002))).

Conversely, we note that a showing of past persecution under 8 U.S.C. § 1101(a)(42) need not be a necessary condition for asylum eligibility to be established. An applicant

who demonstrates a well-founded fear of future persecution is not required to show that he or she suffered past persecution as well. *See Guan Shan Liao,* 293 F.3d at 67.

4. The "stricter test," including as it does the need to show that deportation would lead to the applicant's life or freedom being threatened, incorporates the requirement that likely future persecution rather than just past persecution be demonstrated.

under CAT, however, [an applicant] must establish that there is greater than a fifty percent chance (i.e. that it is 'more likely than not') that he will be tortured upon return to his or her country of origin."); 8 C.F.R. § 208.16(c)(2).

 Importantly, the IJ or BIA must consider all evidence of possible torture independent of the IJ's or BIA's analysis of asylum claims. In other words, it is reversible error to conclude that a CAT claim is "necessarily precluded because [an applicant] had failed to carry his burden of proof with respect to his asylum claim." *Ramsameachire*, 357 F.3d at 184.

### III.

 We apply the deferential substantial evidence standard in evaluating factual findings of the BIA or IJ. *See Wu Biao Chen v. INS*, 344 F.3d 272, 275 (2d Cir. 2003) (per curiam). The BIA's or IJ's determination will be upheld if it is supported by reasonable, substantial and probative evidence in the record. *See Alvarado–Carillo v. INS*, 251 F.3d 44, 49 (2d Cir.2001) (noting that "[s]ubstantial evidence ... is more than a mere scintilla" and that it "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (internal quotation marks omitted)); *Jin Shui Qiu,* 329 F.3d at 149 ("Substantial evidence review ... is slightly stricter than the clear-error standard ... yet we will not reverse the BIA simply because we disagree with its evaluation of the facts." (internal quotation marks omitted)).

 We review *de novo* questions of law regarding "what evidence will suffice to carry any asylum applicant's burden of proof." *Id.* at 146 n. 2. Importantly, if the IJ or BIA were to use an "inappropriately stringent standard when evaluating an applicant's testimony," we would treat that as a legal, rather than factual error. *See Secaida–Rosales v. INS*, 331 F.3d 297, 307 (2d Cir.2003).

 Where, as in this case, the BIA summarily affirms the IJ's decision, we review the decision of the IJ directly. *See id.* at 305.

### IV.

 Islami's principal claim of persecution involves his refusal to join the Serb-dominated national army. Typically, compulsory military service does not provide asylum seekers with adequate cause for claiming persecution. *See, e.g., Foroglou v. INS*, 170 F.3d 68, 71 (1st Cir.1999); *Krastev v. INS*, 101 F.3d 1213, 1217 (7th Cir.1996). Courts, however, have identified two broad exceptions to this rule. First, if an individual's refusal to serve in the military leads to disproportionately excessive penalties, inflicted on him or her because of that individual's race, religion, nationality, membership in a particular social group, or political opinion, he or she may be eligible for asylum. *See Mekhoukh v. Ashcroft*, 358 F.3d 118, 126 (1st Cir.2004). Second, an individual may be eligible for asylum if he or she is fleeing to avoid punishment for refusing to join a "military force condemned by the international community." *See Vujisic v. INS*, 224 F.3d 578, 581 (7th Cir.2000); *see also Mekhoukh*, 358 F.3d at 126 (noting that for an applicant to be eligible for asylum on this basis the military must be condemned by the international community as one that commits human rights abuses and that the petitioner must have a conscientious objection to serving in that military).

Here, the IJ's finding that Islami was unlikely to receive disproportionately excessive penalties simply because he was an ethnic Albanian was supported by substan-

tial evidence.[5] But, the IJ erred in failing to recognize that service in the Yugoslavian army would likely require Islami's participation in military campaigns widely "condemned by the international community as contrary to the basic rules of human conduct." *M.A. v. INS*, 899 F.2d 304, 312 (4th Cir.1990); *see also Mekhoukh*, 358 F.3d at 126 (describing political and conscientious objection to participation in a military whose activities have been condemned by the international community); *Vujisic*, 224 F.3d at 581 (same).

In this respect, we adopt the aforementioned exceptions to the general rule against compulsory military service providing a basis for a persecution claim. Moreover, we hold that for those individuals who seek to avoid serving in a military whose brutal and unlawful campaigns are directed at members of their own race, religion, nationality, or social or political group, the requirements for stating a persecution claim are met at a significantly lower threshold of military wrongdoing than would be required if the objections are simply a matter of conscience. On this basis, we conclude that Islami's fear of retribution for refusing to participate in a military known to perpetrate crimes against humanity—and specifically against fellow Muslims and ethnic Albanians— clearly rose to the level of past persecution.

With respect to Islami's other claims of harassment by ethnic Serbs, we find that the IJ did not clearly err in holding that those actions do not constitute persecution. *See Tian–Yong Chen v. INS*, 359 F.3d 121, 128 (2d Cir.2004) (noting that general harassment not rising to the level of sufficiently extreme action, such as violence and physical abuse, does not constitute persecution).[6]

**V.**

As noted above, *see supra* note 3, even if an alien establishes that he or she has been persecuted in the past, "asylum may be denied as a matter of [the Attorney General's] discretion if there is little likelihood of present [or future] persecution." *Matter of Chen*, 20 I. & N. Dec. 16, 18 (BIA 1989). Accordingly, even though Islami demonstrated that he was the victim of past persecution, we must determine whether the Government's showing of changed country conditions in Yugoslavia rebutted the presumption of future persecution.

In a case such as the one before us, where past persecution is established, the weight of the Government's burden in rebutting the presumption of future persecution depends at least in part on the degree to which the past and future persecutions are of the same sort. That is, if the past and alleged future forms of abuse implicate the same policies or practices, the

---

5. We express no opinion on whether Islami or a *similarly situated* ethnic Albanian could show that his or her refusal to serve in the Yugoslavian military would result in excessive punishment. *See, e.g., Begzatowski v. INS*, 278 F.3d 665, 670 (7th Cir.2002) (describing the Yugoslavian military and *its* egregious treatment of ethnic Albanian soldiers). It suffices for these purposes that the IJ did not clearly err in finding that *Islami* failed to provide evidence of physical abuse.

6. Our conclusion is completely consistent with the granting of asylum to the thirteen other members of Islami's family. They fled Kosovo later than Islami did, and at the time they left, the level and type of persecution was concededly of a different order than that which the IJ found had existed when Islami left. Similarly, it is not disputed that the conditions in Kosovo were much less stable and secure at the time the family members were seeking asylum than now, given the subsequent NATO occupation and change in the government in Belgrade.

burden is great—and the Government must show that country conditions have changed radically. But if the past persecution and fear of future torment involve essentially different concerns, then the Government's burden is correspondingly lighter.

Here, the past persecution consisted of the Serb-led military engaging in ignominious activities, and Islami having to flee to avoid participation in such acts which, in many instances were perpetrated against his own besieged ethnic/religious community. Islami's prospective fears, on the other hand, are not at all related to institutionalized persecution from the national military, but instead center on alleged scattered incidents of continued harassment and abuse of ethnic Albanians. Under these circumstances, the burden of showing changed conditions is more easily met. And, by presenting copious evidence that the nationalistic Serb domination of Kosovo has ended, the Government has adequately rebutted the presumption of future persecution.[7] Accordingly, the conclusion of the IJ is supported by substantial evidence, and Islami's asylum—and, *a fortiori*, withholding of deportation—claim must fail.

## VI.

■ Finally, because Islami did not come close to showing that he was likely to be tortured were he to be returned to Kosovo, the IJ's denial of CAT relief was amply supported by substantial evidence. *See Mu–Xing Wang,* 320 F.3d at 134.

7. Moreover, Islami's past persecution does not rise to the level of extreme or "atrocious" persecution, a condition which, if met, would require that Islami be granted asylum even in the face of a drastically improved political situation in his home country. *See Matter of Chen,* 20 I. & N. Dec. at 18.

## VII.

Islami's petition for review is therefore DENIED, and the outstanding motion for stay of removal is DENIED.[8]

8. As the IJ noted, because many in Islami's family have become permanent residents of the United States, Islami may well have a good chance of regularizing his immigration status and gaining admission to the United States through non-asylum channels. We hope so. But that issue is not before us today.