**Yueqing ZHANG, Petitioner,**

v.

**Alberto GONZALES,\* United States Attorney General, Respondent.**

**Docket No. 02–4533.**

United States Court of Appeals, Second Circuit.

Argued: April 28, 2005.

Decided: Oct. 13, 2005.

\* The Clerk of the Court is directed to substitute Attorney General Gonzales for the named respondent, former Attorney General John Ashcroft, pursuant to Federal Rule of Appellate Procedure 43(c)(2).

Jeffrey C. Bloom, Jeffrey C. Bloom, P.C., Flushing, New York, for the petitioner.

Christopher J. Christie, United States Attorney, District of New Jersey (Susan Handler–Menahem, Assistant United States Attorney, on the brief), Newark, NJ, for the respondent.

Before: SOTOMAYOR, PARKER, and HALL, Circuit Judges.

SOTOMAYOR, Circuit Judge.

Yueqing Zhang petitions for review of an August 28, 2002 order of the Board of Immigration Appeals ("BIA") affirming without opinion an August 23, 2001 order of an Immigration Judge ("IJ") denying Zhang's claims for asylum under 8 U.S.C. § 1158(a) and withholding of removal under 8 U.S.C. § 1231(b)(3).[1] Of relevance to this appeal, the IJ denied Zhang's claims for asylum and statutory withhold-

---

**1.** Zhang has abandoned any challenge to the IJ's denial of his claim for withholding ·of removal under the United Nations Convention Against Torture and its implementing regulations, *see* 8 C.F.R. § 208.16(c) (2001), by failing to discuss this claim anywhere in his brief. *See Norton v. Sam's Club,* 145 F.3d 114, 117 (2d Cir.1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

ing of removal on the ground that Zhang's opposition to extortion by corrupt government officials in his home city did not constitute "political opinion" within the meaning of 8 U.S.C. §§ 1101(a)(42) and 1231(b)(3)(A). We grant the petition for review and remand for reconsideration of Zhang's claims because retaliation for opposition to government corruption may, in appropriate circumstances, constitute persecution on account of political opinion within the meaning of those statutes.

## BACKGROUND

Zhang's claims for relief, as set forth in his written application and his hearing testimony, were based primarily on his opposition to corruption among local government officials in Tianjin City, China. In May of 1997, Zhang began to help run his father's private auto parts business in Tianjin. Local government officials from the Tax Bureau and the Bureau of Industry and Commerce extorted approximately 9000 Yuan Renminbi ("RMB") from the company in December 1997 and January 1998, demanding payments on various transparent pretexts.[1] According to Zhang, such extortion of privately-owned businesses was common in Tianjin, and his father had previously complied with similar demands. Zhang disagreed with the decision to make the payments, but his father warned him that failure to make them could lead to retaliation by government officials and closure of the business. In May of 1998, a few months after Zhang took over management of the company from his ailing father, an official from the Tax Bureau demanded an additional 6000 Yuan RMB as a putative loan to defray the expense of the official's cousin's wedding. Zhang refused to make the loan, angering the official. The Taxation Bureau subsequently closed Zhang's business for a month-long audit in July of 1998, causing him to lose business.

Zhang testified that by the end of 1998 he was forced to pay government officials 29,000 Yuan RMB on various other pretexts. Frustrated with this extortion, Zhang drafted a letter of protest to the mayor of Tianjin in January of 1999, alleging that the Tax Bureau, the Bureau of Industry and Commerce, and the Public Security Bureau were riddled with corruption. He then solicited support from other local business owners, three of whom added their signatures to the letter. Zhang claimed that after the four businessmen sent the letter, the officials retaliated against the signatories' companies. Zhang's company lost its tax registration license and a license issued by the Bureau of Industry and Commerce, forcing its closure; the other three companies also faced retaliation from the government in the form of fines or forced closures. For the next six months, Zhang sought in vain to obtain new permits that would enable him to resume business. On August 8, 1999, he obtained a meeting with Guowen Rei, an official at the Bureau of Industry and Commerce who was also, Zhang later learned, the nephew of the mayor and general secretary of the Communist Party in Tianjin. Rei asked Zhang for 9,900 Yuan RMB for his child's schooling. Zhang refused and explained that if Rei did not allow Zhang's company to reopen, Zhang would have no means to survive. Rei called the police, who forcibly removed Zhang from the building and transported him to the local police station. Zhang explained to the police that Guowen Rei had tried to extort money from him and the police demanded that he produce evidence to substantiate the charge. When Zhang said he was unable to do so, the police accused him of making false charges

---

1.  As of January 1, 1998, 9000 Yuan RMB was  equivalent to roughly $1,087 in U.S. dollars.

and then beat, kicked and shocked him. Zhang was then detained for fifteen days for having disrupted the functioning of a government office.

Upon his release, Zhang consulted several lawyers, all of whom declined to help him. In September of 1999, Zhang wrote a letter to the official Tianjin newspaper repeating his charges of widespread local corruption and charging that extortion of business owners was common throughout China. The newspaper did not publish the letter. Instead, Zhang received in response a letter from a reporter telling him that the editor would not publish a critique of public officials. The reporter advised Zhang to be careful before taking further action and wished him well, but also told him that he would forward the letter to the Public Security Bureau "for the top leader to read." In October of 1999, officials of the Public Security Bureau and the Bureau of Industry and Commerce came to Zhang's home. After learning that Zhang was not at home, the officials told his wife that they wanted him to come to their office to discuss his "opinion regarding . . . them." Warned by his wife, Zhang did not return home after this incident. An acquaintance, who was a court official, also advised Zhang that he was "in trouble" with the nephew of the mayor and general secretary of the Communist Party in Tianjin and that he had "better not go home" and "better run now." Zhang traveled to Ninjing, where he stayed first with a friend and later in a small hotel. The police continued to look for him at his home in Tianjin. Concerned that he could not evade public security authorities indefinitely without proper identification, Zhang fled to the United States in May of 2000.

Once here, Zhang participated in the activities of an organization variously identified as either the China Refugee Council or the China Refugee Committee, which is opposed to one-party Communist rule in China. He learned from his wife that public security officials continued to visit his home. According to an October 2000 letter from Zhang's wife, another signatory of Zhang's original letter to the mayor made further appeals to authorities in Beijing and was subsequently imprisoned for Falun Gong membership. In July of 2001, Zhang's wife informed him in a letter that public security officials had returned to his house and taken away letters and photos Zhang had sent her regarding his political activities; these officials told his wife that they knew that he was colluding with "reactionary forces abroad to attack the Chinese Communist Party and Central Committee." The police treated his wife roughly during this episode.

At the conclusion of Zhang's hearing, the IJ delivered a brief oral decision denying all of Zhang's claims for relief, which we discuss in detail below. Zhang appealed the denial of his claims to the BIA, which affirmed without opinion the results of the IJ's decision pursuant to the then-applicable regulation, 8 C.F.R. § 3.1(a)(7) (2002).[2] This timely petition for review followed.

## DISCUSSION

*1. Standard of review*

▇▇▇▇ Because the BIA summarily affirmed the IJ's decision, we review the decision of the IJ directly. *Islami v. Gonzales,* 412 F.3d 391, 396 (2d Cir.2005). The IJ's findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also Dong v. Ashcroft,* 406 F.3d 110, 111 (2d Cir.2005). We review *de novo* the IJ's application of legal principles to undisputed facts. *Ramsameachire v. Ashcroft,* 357 F.3d 169, 178

---

2. This regulation has since been recodified as amended at 8 C.F.R. § 1003.1(e)(4).

(2d Cir.2004); *Guan Shan Liao v. United States DOJ*, 293 F.3d 61, 66 (2d Cir.2002). Where application of the law rests on an interpretation of an ambiguous provision of the Immigration and Nationality Act ("INA") or its implementing regulations, we defer to the BIA's settled and reasonable view. *INS v. Aguirre–Aguirre*, 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). We do not, however, extend *Chevron* deference to the BIA's affirmance without opinion of an IJ decision construing the INA. *Shi Liang Lin v. United States DOJ*, 416 F.3d 184, 190–91 (2d Cir. 2005). An IJ's interpretation of ambiguous provisions of the INA is entitled no more deference than the inherent persuasiveness of the IJ's view commands. *See id.* at 191 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

## 2. The "on account of" requirement

In order to qualify for asylum, an applicant must establish that he or she meets the statutory definition of a "refugee" contained in 8 U.S.C. § 1101(a)(42)(A). *See* 8 U.S.C. § 1158(b)(1) (2000)[3]; 8 C.F.R. § 208.13(a) (2001) ("The burden of proof is on the applicant for asylum to establish that he or she is a refugee as defined in [8 U.S.C. § 1101(a)(42) ].")"; *see also Islami*, 412 F.3d at 394–95. A "refugee" is defined in relevant part as a person who is unable or unwilling to return to his or her native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[4] 8 U.S.C. § 1101(a)(42)(A). Similarly, an applicant will qualify for withholding of removal only upon a finding that it is more likely than not that "the alien's life or freedom would be threatened [upon removal to a country] ... because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A) (2000)[5]; 8 C.F.R. § 208.16(b) (2001); *Ramsameachire*, 357 F.3d at 178. Although the statutory provision governing withholding uses the term "because of" rather than "on account of" and does not incorporate by direct reference the definition of "refugee" in § 1101(a)(42), we treat as identical the requirement under each statute of showing that persecution relates to an enumerated ground. *See, e.g., Islami*, 412 F.3d at 394–95; *Ramsameachire*, 357 F.3d at 178 (noting that "the withholding of removal analysis overlaps factually with the asylum analysis, but involves a higher burden of proof [as to the likelihood of future persecution]"). We therefore dis-

---

**3.** Section 1158 was substantially amended by the Real ID Act of 2005, Pub. L. No. 109–13, Div. B., tit. I § 101(a), 119 Stat. 231, 302–03 (May 11, 2005). This and future references to § 1158 refer to the statute as it existed at the time of the IJ's decision.

**4.** Although the statutory definition of a refugee speaks disjunctively of "persecution or a well-founded fear of persecution," in order to establish asylum eligibility, the applicant must demonstrate a well-founded fear of future persecution. *Islami*, 412 F.3d at 395 n. 3. The applicant may seek to prove well-founded fear in two ways. One is to demonstrate that he

or she has suffered past persecution, in which case a rebuttable presumption arises of a well-founded fear of future persecution. *Ramsameachire*, 357 F.3d at 178. The applicant may also demonstrate a well-founded fear of future persecution through credible testimony that he or she subjectively fears persecution and evidence showing that this fear is objectively reasonable. *Id.*

**5.** Section 1231(b)(3) was also amended by the Real ID Act. Real ID Act § 101(b), 119 Stat. at 303–04. Again, we refer in this opinion to the statute as it existed at the time of the IJ's decision.

cuss only § 1101(a)(42) in the balance of this opinion.

■■■ In order to establish persecution "on account of" political opinion under § 1101(a)(42), an asylum applicant must show that the persecution arises from his or her own political opinion. *INS v. Elias–Zacarias,* 502 U.S. 478, 482, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Thus it is not sufficient that the persecutor act from "a generalized political motive." *Id.* at 482, 112 S.Ct. 812 (internal quotation marks omitted). The applicant must also show, through direct or circumstantial evidence, that the persecutor's motive to persecute arises from the applicant's political belief. *Id.* at 483, 112 S.Ct. 812; *see also Xin–Chang Zhang v. Slattery,* 55 F.3d 732, 751 (2d Cir.1995) ("[T]he focus of the statute is on the victim's opinion (and whether the persecuted is visited by reason of that opinion)."), *abrogated on other grounds by statute,* 8 U.S.C. § 1101(a)(42). It follows from these principles that where the applicant's political belief takes the form of opposition to a government policy or prac-

tice that is visited on the population at large, mere subjection to that policy or practice will not itself qualify as persecution "on account of" political opinion. Instead, "an applicant for refugee status must establish a fear of reprisal that is different in kind from a desire to avoid the exactions (however harsh) that a foreign government may place upon its citizens." *Xin–Chang Zhang,* 55 F.3d at 751. That is, an applicant must establish a fear of reprisal "on account of" having demonstrated opposition to the government policy.[6]

### 3. *Zhang's claim*

Zhang's principal claim of persecution relates to the consequences of his opposition to the repeated extortionate activity of government officials—opposition he categorized as political in his asylum application.[7] As noted above, the IJ rejected this claim on the ground that it "is not within any of the enumerated grounds set forth in Section [1101(a)(42)]." In particular, the IJ found that Zhang "desires to be free

**6.** The particular result reached in *Xin–Chang Zhang*—affirmance of the BIA's view that prosecution for evasion of China's coercive family planning policies cannot constitute persecution on account of political opinion under § 1101(a)(42), *id.* at 751–52—has been abrogated by a subsequent amendment to § 1101(a)(42) expressly providing that "a person ... who has been persecuted for failure or refusal to undergo [abortion or forced sterilization] or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion." 8 U.S.C. § 1101(a)(42) (as amended by Pub.L. No. 104–208, § 601(a)(1), 110 Stat. 3009–689 (1996)). The broader principle we draw from the case, however, flows from *Elias–Zacarias, see Xin–Chang Zhang,* 55 F.3d at

751, and remains good law. *See, e.g., Islami,* 412 F.3d at 396 (noting the general rule that "compulsory military service does not provide asylum seekers with adequate cause for claiming persecution" except, *inter alia,* where refusal to be conscripted subjects the applicant to severe retribution on account of an enumerated ground).

**7.** Zhang also claimed to fear future persecution based on his political activities since departing China; the IJ found that he had not shown that the authorities knew, or were concerned, about this activity. On this appeal, Zhang devotes only a single conclusory sentence to the argument that he met his burden of showing a well-founded fear of persecution on this ground. We therefore deem his petition for review of the IJ's finding as to this claim abandoned and do not consider it. *See Norton,* 145 F.3d at 117 ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

from ... extortion or corruption or blackmail which in the opinion of the court is not a basis for granting relief under Section [1158]. The acts of extortion, corruption or blackmail are not in the opinion of the court persecution." The IJ rejected Zhang's claim that he attempted to be a "whistle blower," holding that his "letter writing and attempt to publish a complaint in the newspaper is not in the opinion of the court covered under 'political opinion' of Section [1101(a)(42)]." The IJ also found that the closure of Zhang's business, his detention, and the fact that he was sought by the authorities neither constituted persecution nor gave rise to a well-founded fear of persecution.

■ Although the logic of the IJ's holding is not fully apparent from his decision, he appears to have reasoned in two steps, holding first that Zhang's subjection to extortionate activity was not persecution "on account of" political opinion, and then holding that Zhang's public opposition to the government's corrupt practices did not constitute political opinion within the meaning of the INA. The first holding, that subjection to extortion is not persecution within the purview of the statute merely because the victim happens to dislike the practice, is consistent with the standard elaborated in *Elias–Zacarias* and our own caselaw. *Cf. Elias–Zacarias*, 502 U.S. at 483, 112 S.Ct. 812 (holding that an applicant opposed to conscription by guerillas must show that the guerillas would persecute him because of his political opposition to their cause, rather than because of his refusal to fight with them); *Zhang*, 55 F.3d at 751 (reasoning that an applicant's prosecution for noncompliance with a policy of general applicability based on the applicant's desire not to have the policy applied to him does not constitute persecution on account of political opinion (citing *Elias–Zacarias*, 502 U.S. at 482–83, 112 S.Ct. 812)). In resting his second holding on the categorical rule that opposition to government extortion cannot serve as the basis for a claim based on "political opinion" within the meaning of the INA, however, the IJ both misapprehended the nature of Zhang's claim and failed to undertake the analysis required by our decision in *Osorio v. INS*, 18 F.3d 1017 (2d Cir.1994).

In *Osorio*, we rejected an "impoverished view of what political opinions are, especially in a country ... where certain democratic rights have only a tenuous hold." *Id.* at 1030. We held that the BIA unreasonably interpreted § 1101(a)(42) in concluding as a matter of law that Osorio, a union leader persecuted for his union activity, was not persecuted on account of political beliefs, but merely for "economic" disputes with the government. *Id.* at 1028–30. Rejecting any bright-line distinction between the "political" and the "economic," we found that Osorio's union activism subjected him to persecution "because he and his union posed a political threat to [government] authority via their organized opposition activities," *id.* at 1029, and held that such persecution constituted persecution "on account of ... political opinion" under § 1101(a)(42), even though the threat arose from opposition to the government's economic policies and even though Osorio and the members of his union stood to gain financially from successful opposition to those policies. *Id.* at 1029–30. We noted that the United Nations' Handbook on Procedures and Criteria for Determining Refugee Status ("UN Handbook") provides that

what appears at first sight to be primarily an economic motive for departure may in reality also involve a political element, and it may be the political opinions of the individual that expose him to serious consequences, rather than his objections to the economic measures themselves.

*Id.* at 1029 (quoting UN Handbook, at §§ 62–64).[8] We held that determining whether a given individual's attempt to oppose or alter a government's economic practices manifests a political opinion requires examination of the "political context" in which the dispute took place in order to determine whether the dispute bears a "political dimension." *Id.* Where the dispute is such that the asylum seeker did not merely seek economic advantage but mounted a challenge to the legitimacy and authority of the ruling regime itself, and where the applicant can show that this "political threat" is the motive for the persecution perpetrated or feared, the applicant can meet the definition of a "refugee." *See id.*

The IJ reasoned conclusorily here that because Zhang "desire[d] to be free from ... extortion or corruption," his activities in opposition to these practices were not "covered under 'political opinion' " within the meaning of the INA. Zhang did not, however, proceed on the theory that his initial unwillingness to meet officials' demands to make unwarranted payments constituted an expression of political belief for which he was persecuted. As both his asylum application and his subsequent briefs to the BIA and this Court make clear, Zhang's theory of the case is quite different. He argues that the dispute became political when he decided to marshal support from similarly afflicted business owners and to attempt to publicize and criticize endemic corruption extending beyond his own case. Zhang argues that at this stage his efforts were transformed from a purely self-interested attempt to shield his business from greedy bureaucrats into a challenge to the legitimacy of the municipal government; this was the point at which the government closed his business, detained and beat him, and sent public security officials to his home to discuss "his opinion of them." On Zhang's theory, then, what began as an attempt by government officials to extort him became an attempt to repress his challenge to the government's legitimacy. It is clear under *Osorio* that if Zhang can show that the government acted with the latter motive, his claim is "covered under 'political opinion' " within the meaning of § 1101(a)(42).[9]

■ The government seeks to distinguish *Osorio* on the grounds that, *inter alia*, it concerned trade unionism in Guatemala, a broad social movement which at the time in question was very clearly a "vehicle[ ] for political expression" that was suppressed because it "challenge[d] the political status quo" through mass activism for improved living conditions for the poor. *Osorio*, 18 F.3d at 1030 (collecting scholarship); *see also id.* at 1024 (collecting news accounts), at 1025–26 (discussing expert testimony and reports). We reject any categorical distinction between opposition to extortion and corruption and other disputes with government policy or practice. As other circuits have recognized, opposition to endemic corruption or extortion, no less than opposition to other government practices or policies,

---

8. The UN Handbook does not carry the force of law but " 'provides significant guidance in construing the [1968 United Nations] Protocol [Relating to the Status of Refugees], to which Congress sought to conform' " in enacting the asylum-related provisions of the INA. *Osorio*, 18 F.3d at 1027 n. 4 (quoting *INS v. Cardoza–Fonseca*, 480 U.S. 421, 439 n. 22, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).

9. *Accord Gonzales–Neyra v. INS*, 122 F.3d 1293, 1296 (9th Cir.1997) (holding that an asylum seeker established persecution on account of political opinion where he refused guerillas' demands for money and guerillas threatened him after learning he opposed their views, because "[t]he persecution of which [the applicant] complains is not the extortion, but the threats upon his life and business that were made after the guerrillas learned of his political orientation").

may have a political dimension when it transcends mere self-protection and represents a challenge to the legitimacy or authority of the ruling regime. *See Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (noting that persecution based on "ideologically motivated" opposition to government corruption may constitute grounds for asylum); *Hasan v. Ashcroft*, 380 F.3d 1114, 1120 (9th Cir.2004) (holding that a journalist raised "indisputably political issues" when she accused a local political leader of "organizing a cadre of 'terrorism, repression, and extortion,' of 'misappropriation of public money,' . . . and of making his political office 'an office of corruption.' "); *Marquez v. INS*, 105 F.3d 374, 381 (7th Cir.1997) (noting that "[w]idespread corruption may not be a ground for asylum, but political agitation against state corruption might well be," and that a hypothetical asylum applicant who "spoke[ ] out repeatedly as a public gadfly about reforming a corruption-ridden government" could qualify for asylum); *Desir v. Ilchert*, 840 F.2d 723, 727 (9th Cir.1988) (holding that a Haitian national's treatment as a subversive on the basis of his "refusal to accede to extortion in a political system founded on extortion" constituted persecution on account of political opinion; observing that "[t]o challenge the extortion by which the [Ton Ton] Macoutes exist is to challenge the underpinnings of the political system" (internal quotation marks omitted)).

Where an asylum applicant opposes government extortion, he or she will often stand to gain financially from a successful challenge to the practice, and corrupt officials, if they are themselves persecutors, may well be motivated by a pecuniary desire to shield their activities from detection. But the persecutor's motive need not be *solely* to overcome the applicant's political opinion. *Osorio*, 18 F.3d at 1028. The important questions for determining the nature of the applicant's opposition are whether the applicant's actions were "directed toward a governing institution, or only against individuals whose corruption was aberrational," *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1135 (9th Cir.2004) (citation and internal quotation marks omitted), and whether the persecutor was attempting to suppress a challenge to the governing institution, as opposed to a challenge to isolated, aberrational acts of greed or malfeasance.

Here, the IJ made no effort to examine the context of Zhang's activities or the nature of his opposition to the government's extortionate practices; nor did the IJ make any finding regarding Zhang's assertion in his written application that the government's motive in closing his company and detaining him was revenge for the letters of protest he had written. Instead, the IJ relied on an improper and impoverished view of what may constitute political opposition to hold simply that Zhang's efforts were not "covered" by § 1101(a)(42). *See Osorio*, 18 F.3d at 1030.

■ As the foregoing discussion makes clear, the requisite determination of whether Zhang adduced sufficient evidence to show that his persecutors were motivated by his opposition to the government itself is a complex and contextual factual inquiry. *See Osorio*, 18 F.3d at 1029 (faulting the BIA for failing to examine the political context of a dispute in determining whether the relevant causal connection exists); *see also De Brenner v. Ashcroft*, 388 F.3d 629, 638 n. 2 (8th Cir.2004) (noting that "careful attention to the particular circumstances surrounding the alleged persecution [is] necessary" in determining whether persecution is on account of political opinion). Because the IJ did not undertake this inquiry, the appropriate course is to grant the petition for review and remand the case to the agency for consideration in the first instance of

whether Zhang made the requisite showing.[10] *INS v. Orlando Ventura*, 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) ("[T]he law entrusts the agency to make the basic asylum eligibility decision .... In such circumstances a 'judicial judgment cannot be made to do service for an administrative judgment.' ") (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943)); *see also Qiu v. Ashcroft*, 329 F.3d 140, 157 (2d Cir.2003) (remanding case for further consideration where BIA misapplied applicable legal principles to the evidence); *Alvarado–Carillo v. INS*, 251 F.3d 44, 46–47 (2d Cir.2001) (same).

### CONCLUSION

For the foregoing reasons, we grant the petition for review and remand the case to the BIA for further proceedings consistent with this opinion.

10. For this reason, we do not address the government's argument that Zhang "presented absolutely no threat to the authority of the local Chinese government." Consideration of that issue is properly reserved for the agency in the first instance. We note, however, that Zhang testified that public security officials accompanied by officials of the Tax Bureau and Bureau of Public Affairs informed Zhang's wife that he should report to them to discuss "his opinion regarding ... them," suggesting that it was not merely Zhang's nonpayment that occasioned their visit. In addition, Zhang testified that a court official informed him that he was "in trouble" with the nephew of the mayor and general secretary of the Communist Party in Tianjin and that he had "better run now."