United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 17, 2006**

Charles R. Fulbruge III
Clerk

I n the

# United States Court of Appeals
## for the Fifth Circuit

———————

m 05-60585
Summary Calendar

———————

FLORIE SHEHU,

Petitioner,

VERSUS

ALBERTO R. GONZALES,
U.S. ATTORNEY GENERAL,

Respondent.

———————

Petition for Review of an Order
of the Board of Immigration Appeals

———————

Before SMITH, GARZA, AND PRADO,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Florie Shehu, a Kosovar Muslim who fled her country during the 1998 turmoil, appeals the decision of the Board of Immigration Appeals ("BIA"), which summarily affirmed the decision of the Immigration Judge ("IJ") denying her petition for asylum. The IJ found Shehu to be a credible witness and that Shehu had established past persecution. Because she established past persecution, Shehu was entitled to a rebuttable presumption of a well-founded fear of future persecution, with the burden on the government to prove, by a preponderance of the evidence, that circumstances in Kosovo had changed to such degree that

Shehu's fear was no longer "well-founded."[1]

The IJ found that the government has met that burden. On appeal, Shehu argues that the IJ's findings were general and did not respond to her individualized factual statements demonstrating fear of future persecution. She also argues that any alleged change in Kosovo is not a "fundamental" change and that she was entitled to humanitarian asylum.

We must affirm if the decision is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). We will reverse only if we determine that the evidence compels a different result. *Id.*

## I.

This court has not considered what limitations should be placed on inferences that can be drawn from generalized evidence of changed country conditions. Even assuming that we would require the government to negate the applicant's individual fear of persecution, the evidence effectively negates Shehu's individual fear of persecution.

All instances of past persecution that Shehu has cited, on behalf of herself or of her relatives, were at the hands of the Serbian-dominated police or Serbian paramilitary forces. The IJ found, howeverSSand the finding is supported by substantial evidenceSSthat the Kosovo administration (and police) are no longer dominated by Serbs, but by the United Nations Interim Administrative Mission in Kosovo ("UNMIK") and Provisional Institutions of Self Government ("PISG").

The Serbian paramilitary forces have left Kosovo. Moreover, we take judicial notice of the 2003 Country Report, which states that "the high level of revenge-based violence that followed Yugoslavia's 1999 withdrawal continued to decline significantly," and that there were "several instances of Serb violence against Kosovo Albanians, but no reported fatalities."[2] *Erebara v. Ashcroft*, 124 Fed. Appx. 444 (7th Cir. 2005) (taking judicial notice of the same report).

The identity of the current Kosovar government is therefore different from that of the past government that persecuted the Shehus. The Serbian paramilitary forces have also left the country. Whatever harassment or violence against former KLA members and their families still exists cannot be labeled "persecution" absent some proof that the current UNMIK and Albanian-controlled Kosovar government "condoned it or at least demonstrated a complete helplessness to protect the victims." *Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000).

The record does not compel or even support a conclusion that Mr. Shehu's crash, which petitioner labels attempted killing, was orchestrated or condoned by the current government. The IJ stated that "[r]espondent does not specifically address who her

---

[1] *See* 8 C.F.R. § 208.13(b)(1)(i), (ii); *Zhu v. Ashcroft*, 382 F.3d 521, 529 & n.6 (5th Cir. 2004); *Poradisova v. Gonzales*, 420 F.3d 70, 78 (2d Cir. 2005).

[2] *See Dobrota v. INS*, 195 F.3d 970, 973 (7th Cir. 1999) (taking judicial notice of most recent Country Report to determine current country conditions); United States Department of State, Country Reports on Human Rights PracticesSS2003: Serbia and Montenegro (Feb. 25, 2004), available at www.state.gov/g/drl/rls/hrrpt/2003-/27874pdf.htm.

husband's enemies were and why she believes they are still at large in Kosovo." A.R. 91.

In fact, the most current country report, of which we also take judicial notice, states that "[t]here were no politically motivated killings by UNMIK, the PISG, KFOR, or their agents" and that "UNMIK and the PISG generally respected the human rights of Kosovo's residents" with some exceptions with respect to violations of the rights of Kosovo Serbs.[3] That is, it is Serbs, not Albanians, who appear most of risk of potential persecution. Because Shehu has not presented any direct or circumstantial evidence that would connect the government to her husband's car crash, the IJ was not required to believe her speculative *opinion* as to the origin of the crash, even if he believed her *factual* account that there was a crash.

Contrary to Shehu's assertions, even if her factual testimony that a car crash occur might not require corroboration if credible, there is no ban on the IJ's asking for corroboration on the applicant's *opinion* testimony that the current Kosovar government condoned the crash, especially given that there is no factual basis to make such an opinion inference. For instance, there is no evidence that the Shehus reported the crash to the police or requested protection, and whether that effort was in vain. Although the violence against former KLA members reported by Shehu's expert is unfortunate, there is no "persecution" absent proof that the violence is condoned or orchestrated by the current Kosovar government. Therefore, the IJ did not misapply the corroboration rule, and

the record does not compel a conclusion that the change in circumstances did not negate Shehu's alleged fear of persecution.

Decisions from other jurisdictions have reach similar conclusions.[4] The Second Circuit has recently held, for instance, that where the past and future forms of abuse implicate different policies or practices, the government's burden in proving changed country conditions is lighter than if the abusive practices implicated the same concerns. *See Islami v. Gonzales*, 412 F.3d 391, 397 (2d Cir. 2005). Because Islami's prospective fears were not related to "institutionalized persecution" from the government and military, but instead centered on "alleged scattered incidents of continued harassment and abuse of ethnic Albanians," the court found that the presumption of future persecution was adequately rebutted. *Id.* In this case, as in *Islami*, the past and future forms of abuse implicate different policies or practices because the past persecution was institutionalized persecution led by the Serbian-controlled government and paramilitary forces, but the current abuse, although attributed to Serbs, is not linked to the UNMIK and Albanian-controlled Kosovar

---

[3] United States Department of State, Country Reports on Human Rights Practices—2004: Serbia and Montenegro (Feb. 28, 2005), available at http://www.state.gov/g/drl/rls/hrrpt-/2004/41706.htm.

[4] *See, e.g., Grishaj v. I.N.S.*, 101 Fed. Appx. 631 (6th Cir. 2004) (holding that the presumption of future persecution was rebutted by evidence that conditions in Kosovo had changed, because, despite citing some contrary evidence, petitioner has not met her burden of showing that any reasonable adjudicator would be compelled to reach a different conclusion); *Jakaj v. U.S. Dep't of Justice*, 2006 WL 166479, at *1 (2d Cir. Jan. 24, 2006) (finding that presumption of future persecution based on political opinion was rebutted by evidence from state department reports and newspaper articles that the Democratic League of Kosovo, the political party in which Jakaj was an active member, was successful in the 2001 elections).

3

government.

## II.

We also reject Shehu's claim that there was no proof, by a preponderance of the evidence, of a "fundamental" change in country conditions. Shehu asserts that reliance solely on State Department reports was inadequate and that any change that was proved is only "temporary" thus by definition not fundamental.

Contrary to Shehu's allegation that the IJ made his determination as to changed country conditions based solely on the State Department Reports, the IJ stated that "[d]ocuments submitted by both parties, including the State Department's Country Reports on Human Rights Practices for the Federal Republic of Yugoslavia, articles on the current situation in Kosovo, plus a report of an Independent Task Force in the Balkans describe the changes that have occurred in Yugoslavia since the fall of Milosevic." A.R. 89. From the totality of these documents the IJ concluded that "the documents show that the Serbian oppression of ethnic Albanians has been greatly reduced." The IJ also noted that the State Department's reports, which show that circumstances have changed, are corroborated by the report created by the Independent Task Force, which stated that "The Balkan violence of the 1990s has run its course . . . . In Kosovo, the repression of the ethnic Albanians has ended and work has begun to rebuild that damaged society." A.R. 91.

The IJ quoted the State Department Reports that showed that approximately 100,000 Serbs remaining in Kosovo live primarily in the north or in enclaves under the protection of a NATO peacekeeping force and that much of the ethnically motivated violence in the region is now perpetrated by ethnic Albanians. A.R. 90. The IJ noted that the Serbs became so fearful of revenge by the ethnic Albanians that 150,000 Serbs left Kosovo. *Id.*

The IJ also commented that murders in Kosovo decreased from 136 in 2001 to 68 in 2002 and that most of the murders of Serbs and minorities were ethnically motivated, but the killings of Albanians were connected to family and economic rivalries and criminal activities. *Id.* The IJ noted that although there was some Serb violence against ethnic Albanians, it was primarily limited to the Serb-controlled north. *Id.* He explained that the Shehus lived in Junik, which was located in the South, near the border with Albania.

The IJ noted (and this finding is also supported by the most recent Country Report), that freedom of movement for ethnic minorities, particularly Kosovo Serbs, continued to be a serious problem, so Serbs from Northern enclaves could not travel to Junik to endanger the Shehus' lives. Shehu's expert testified that Serbs continued to move freely, but the IJ gave more weight to the State Department reports because Shehu's expert failed to give specific examples to corroborate her opinion. The record does not compel (rather than merely support) a contrary conclusion.

In sum, the IJ found that fundamental changes have occurred in Kosovo because the paramilitary forces that persecuted Shehu in the past no longer control Kosovo. Although Shehu cites to a 2000 article that the NATO forces were unable fully to control the violence, later country reports plainly show that the violence has been significantly decreased, as noted above. Most importantly, there is no evidence that the UN, NATO and Albanian forces controlling Kosovo are orchestrating and condoning violence against ethnic Alba-

4

nians for ethnic or political reasons. The record does not compel a contrary conclusion.

Shehu also argues that only transitory, not fundamental, changes occurred in Kosovo because the Serbian nationalists won a plurality of votes in the Serbian parliament in 2003, so there was risk of backsliding in the region. This argument is frivolous. Although Kosovo is technically part of Serbia and Montenegro, it has significant autonomy, its own parliament in which ethnic Albanians have a majority of votes, and its own administration independent of Serbia. There is no indication that the Serbian nationalists could ever gain control of the Kosovar legislative or executive branches.[5] Therefore, the record does not compel a conclusion that the changes in Kosovo are transitory as opposed to permanent.

### III.

The regulations, namely 8 C.F.R. § 208.13-(b)(1)(iii)(A), nevertheless allow an alien who has been persecuted but is in no danger of being harmed in the future to avoid removal by showing "compelling reasons" for not being returned to his country. Shehu argues that she qualifies under this provision.

For this regulation to be invoked, the past persecution suffered by an alien must be particularly severe, as was the case of the German Jews, the victims of the Chinese Cultural Revolution, survivors of the Cambodian genocide, and a few other such extreme cases.[6] As *Bu*

---

[5] Furthermore, it is uncertain whether after the departure of the NATO forces, Kosovo will even continue to be part of Serbia and Montenegro, or will be recognized as an independent state later this year after the conclusion of UN-led negotiations that are currently taking place in Vienna.

[6] *Bucur v. INS*, 109 F.3d 399, 405 (7th Cir. (continued...)

*cur* explained, "[m]ild persecution may be something of an oxymoron, but the regulation makes clear that a refugee who has no reasonable fear of future persecution must indeed prove that his past persecution was a severe rather than a mild (bordering on 'mere' discrimination) form of persecution." *Bucur*, 109 F.3d at 405.

In *Bucur*, the persecution suffered by a Jehovah's Witness in Romania, where allegedly he was not allowed to practice his religion, was found not to be severe enough as that outlined in past cases such as *Matter of Chen*. Similarly, in *Pergega-Gjonaj v. Gonzales*, 128 Fed. Appx. 507 (6th Cir. 2005) (per curiam), the four months of hard labor and starvation endured by petitioners was found "undoubtedly terrible, and their plight was considered even more difficult as a result of the atrocities committed against their family members," *id.* at 512, yet, the court was "convinced that the suffering inflicted upon these petitioners does not represent the type of extreme case necessary to justify the invocation of § 208.13(b)-(1)(iii)(A)," *id.* at 513.

Like the petitioners in *Bucur* and *Pergega-Gjonaj*, Shehu has been unable to show severe persecution. She argues that severe persecution is demonstrated by the facts (1) that her father was kidnaped and executed; (2) that she

---

[6](...continued)
1997); *see also Gonahasa v. INS*, 181 F.3d 538, 544 (4th Cir. 1999) ("Eligibility for asylum based on severity of persecution alone is reserved for the most atrocious abuse."); *Matter of Chen*, 20 I. & N. Dec. 16, 19-20 (BIA 1989) (humanitarian asylum justified for victim of Chinese Cultural Revolution whose father was tortured for eight years and killed, and who was interrogated, imprisoned, tortured, and starved for nine years, beginning when he was a child, leaving him physically debilitated).

was forced to watch her husband being beaten; (3) being forced into exile and having to escape by foot; (4) having her livelihood as a doctor destroyed; (5) being subjected to artillery and infantry attack for a few days, (6) having a home destroyed by Serbian troops and (7) that her husband was wounded, beaten, and subject to attempted murder.

Facts (1) and (7) do not apply because they do not relate to persecution personally suffered by the petitioner. Similarly, facts (2), (3), and (7) are no more severe than the experience of a vast percentage of those seeking asylum who suffered beatings and were forced into exile. Although these circumstances are terrible, they are not severe enough to warrant application of humanitarian asylum. Furthermore, losing one's type of employment (fact (4)) is not sufficient to show entitlement to humanitarian asylum or even persecution.[7] Shehu's short arrests in 1990 and 1994 also do not constitute persecution, or at least not severe persecution.[8]

Last, although the fact that Shehu and her village were subject to artillery and infantry attacks for a few days does constitute persecution, it is not as severe as that in *Chen*, in which the petitioner was interrogated, imprisoned, tortured, and starved for *nine* years, beginning when he was a child, leaving him physically debilitated. 20 I. & N. Dec. at 19-20. Therefore, the evidence Shehu has presented does not compel a conclusion that she was entitled to humanitarian asylum.

The petition for review is therefore DENIED.

---

[7] *See Capric v. Ashcroft*, 355 F.3d 1075, 1093 (7th Cir. 2004) (holding that termination from job, even in face of other economic hardship, did not constitute persecution, especially considering that economic hardship existed throughout country and petitioner never sought other work); *Medhin v. Ashcroft*, 350 F.3d 685, 689 (7th Cir. 2003) (holding that loss of job because of ethnicity was discrimination but not persecution); *Sharif v. INS*, 87 F.3d 932, 935 (7th Cir. 1996) (finding no persecution where petitioner lost job and found another); *Gormley v. Ashcroft*, 364 F.3d 1172, 1178-80 (9th Cir. 2004) (holding that loss of jobs as a result of South Africa's post-apartheid Employment Equity Act, and inability to find alternate employment, not persecution); *Barreto-Claro v. United States Attorney Gen.*, 275 F.3d 1334, 1340 (11th Cir. 2001) (holding that losing job as taxi driver and finding only "menial work" not persecution); *Zalega v. I.N.S.*, 916 F.2d 1257, 1260 (7th Cir. 1990) (holding that loss of job was "persecution" but not substantial persecution).

[8] *See, e.g., Prela v. Ashcroft*, 394 F.3d 515, 518 (7th Cir. 2005) (stating that being "interrogated at various times by the police, detained for twenty-four hours, harassed for money, and beaten, causing an injury to his hands" does not compel a finding of persecution); *Dandan v. Ashcroft*, 339 F.3d 567, 573-74 (7th Cir. 2003) (concluding that detention for three days without food and beatings that caused facial swelling did not compel a finding of past persecution); *Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir. 1990) (affirming finding that periodic searches, arrests, and detainments did not constitute past persecution).