NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0347n.06
Filed: May 3, 2005

Case No. 04-3226

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MARK PERGEGA-GJONAJ, and RROK PERGEGA, | ) ) ) | |
| Petitioners, | ) ) | ON APPEAL FROM THE UNITED STATES BOARD OF |
| v. | ) ) | IMMIGRATION APPEALS |
| ALBERTO GONZALES, Attorney General, | ) ) | |
| Respondent. | ) ) | |
| _____ | ) | |

BEFORE:  GUY, BATCHELDER and GIBSON[*], Circuit Judges.

ALICE M. BATCHELDER, Circuit Judge.  Petitioners Mark and Rrok Pergega appeal the order of the Board of Immigration Appeals ("BIA") affirming the order of the Immigration Judge ("IJ") denying their petitions for asylum and withholding of removal, as well as the IJ's denial of their requests for humanitarian asylum.  Petitioner Mark Pergega also filed an emergency motion for stay of removal after receiving a bag and baggage letter from the immigration authorities informing him that arrangements had been made for his removal notwithstanding this appeal. Because we agree with the immigration courts that because of changed conditions in Kosovo, petitioners do not qualify for asylum, and that the past persecution suffered by petitioners was not sufficiently severe to warrant a humanitarian grant of asylum, we AFFIRM the orders of removal and DENY Petitioner Mark Pergega's petition for a stay of removal.

---

[*]The Honorable John R. Gibson, United States Court of Appeals Judge for the Eighth Circuit, sitting by designation.

# I.

Mark Pergega and his son Rrok Pergega are ethnic Albanians from the Kosovo region of the former Yugoslavia, now Serbia and Montenegro. In March 1999, the Serbian military entered petitioners' village of Jakov and surrounded the home in which Mark, Rrok, Mark's daughter, Berlinda, and Mark's mother, Maria, were living. Mark's nephew, Dominic, was also present at that time. The Serbs herded all of the Albanian Kosovars in that particular neighborhood into the street and separated the men from the women. Mark, Rrok, Dominic, and the other men were forced into hard labor, while Mark's daughter and mother were taken away with the other women.

The Serbs marched the Albanian men from village to village in the area around Jakov and forced them to dig trenches in which the Serbs could take cover presumably from the air strikes being carried out by the North Atlantic Treaty Organization ("NATO") in an attempt to halt Slobodan Milosevic's military and police campaign against the separatist Kosovo Liberation Army and the Kosovar Albanian civilian population. During this time, petitioners were forced to live outside and endure the elements and they were given only enough food and water to keep them alive. As a result of the harsh conditions in which they were forced to live, Mark's nephew, Dominic, became exhausted and was unable to continue working. The Serbs then machine gunned down Dominic, murdering him in front of Mark and Rrok. When Rrok attempted to help Dominic he was beaten by the Serbs and some of his teeth and his ribs were broken. After three to four months of hard labor, the Serbs began to retreat as a result of the NATO air strikes, leaving Mark and Rrok behind. Petitioners then trekked to the nearby village of Doblabar to stay with relatives until the war ended.

In Doblabar, Mark and Rrok were reunited with Berlinda, and learned that Mark's mother,

2

Maria, had been killed by the Serbs for intervening when Serb soldiers attempted to drag Berlinda away to be raped. During the three to four months that Berlinda was in Serb custody she was raped at least five times. Eventually, Mark, Rrok and Berlinda returned to Jakov and found that their home was in ruins and all of their possessions had either been looted or destroyed during the war.

Meanwhile, in June 1999, the United Nations Security Council passed Resolution 1244 establishing the United Nations Mission in Kosovo ("UNMIK"), which set up an interim civilian administration, and authorized the Kosovo Force ("KFOR"), a NATO-led international military force responsible for establishing and maintaining security in Kosovo. For approximately the next one and a half years, petitioners lived from village to village in Kosovo staying with relatives. Both of them testified at their immigration proceeding that for the year and a half that they lived in Kosovo under United Nations and NATO control they had no problems with any Serbs, although petitioners did state that they fear returning to Kosovo because they believe that the Serbs will one day return.

Even though NATO troops deterred the Serbs from returning, petitioners testified that life in Kosovo was still difficult following the war and that crime and some violence continued. Mark explained, "we don't have bread, we don't have future, we don't have factories, we don't have nothing to eat and only to die." Both petitioners said that they came to the United States primarily because their home had been destroyed, for economic reasons, and to be reunited with family. Two of Mark's other sons and one of his other daughters living in Germany raised $7,000 each for Mark, Rrok, and Berlinda to be smuggled into the United States across the U.S.-Mexico border. Petitioners and Berlinda entered the United States illegally in February 2001. Each of them were served with a Notice to Appear and each of them conceded removability.

3

At the conclusion of their removal proceeding, the IJ specifically found that the testimony of petitioners was generally true and accurate and that, based upon the evidence presented, petitioners had demonstrated past persecution, as well as a subjective fear of returning to Kosovo. Nonetheless, the IJ ultimately concluded that the government had presented sufficient evidence of changed country conditions to rebut any presumption of a well-founded fear of persecution. According to the 2002 State Department Country Report (the most recent available to the IJ), Kosovo continued to be governed by UNMIK, was still under the protection of KFOR, and had recently had its first democratic general elections. The documentary evidence also shows that shortly after international forces wrested control of Kosovo from the Serbs there was a mass influx of nearly one million displaced Kosovar Albanians back to Kosovo and a mass exodus of ethnic Serbs out of Kosovo. As the IJ noted, the record indicates that those who were most likely to be the victim of ethnic violence in Kosovo at the time the removal proceedings took place were the Serbs themselves.

## II.

On appeal of the IJ's denial of petitioners' applications for asylum and withholding of removal pursuant to Sections 208(a) and 241(b)(3) of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158(a) and 1231(b)(3), the BIA affirmed the IJ's decision for the reasons stated therein, and dismissed the appeal with additional comments. When the BIA adopts the decision of the IJ instead of issuing its own opinion, we review the IJ's decision, *Denko v. INS*, 351 F.3d 717, 723 (6th Cir. 2003), but when the BIA adopts the IJ's reasoning and also supplements the IJ's opinion, the IJ's opinion as supplemented by the BIA becomes the basis for review. *Niam v. Ashcroft*, 354 F.3d 652, 655-56 (7th Cir. 2004); *Kataria v. INS*, 232 F.3d 1107, 1112 (9th Cir. 2000). When reviewing

4

a decision of the immigration courts, we review only the administrative record on which the order of removal was based, and "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(A) and (B). Moreover, a discretionary decision to deny asylum under 8 U.S.C. § 1158 "shall be conclusive unless manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D).

The INA grants the Attorney General the *discretionary* power to grant asylum to any alien who qualifies as a "refugee" under 8 U.S.C. § 1101(a)(42). 8 U.S.C. § 1158(b)(1). A "refugee" is defined as any person who is unable or unwilling to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). It is the alien who bears the burden of proving past persecution or a well-founded fear of future persecution. 8 C.F.R. § 208.13(a); 8 C.F.R. § 208.16(b).

In this case, the IJ found that the petitioners testified truthfully and that based on their testimony they had demonstrated past persecution. An alien found to have established past persecution is entitled to a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). The government may rebut this presumption by proving by a preponderance of the evidence that there has been a fundamental change in circumstances such that the alien no longer has a well-founded fear of returning to his country. 8 C.F.R. § 208.13(b)(1)(i)(A); 8 C.F.R. § 208.13(b)(1)(ii). Additionally, the government "must do more than show that circumstances in the country have fundamentally changed; [it] must also show that such change negates the particular applicant's well-founded fear of persecution." *Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003).

The record reveals that the petitioners lived in Kosovo for one and a half years following the

5

Serbs' retreat from the region. During this time, because of NATO's presence, neither petitioner suffered persecution on account of his Albanian ethnicity. At the time the IJ made his decision and even to this day, the international security presence, KFOR, is working with UNMIK in Kosovo to ensure protection for all of Kosovo's communities. The 2001 State Department Country Report for Yugoslavia, for instance, states that the "[t]he U.N. authorized, NATO-led peacekeeping force for Kosovo (Kosovo Force, or KFOR), which included forces from all 19 NATO countries and some 20 non-NATO members, continued to carry out its mandate to maintain internal security and defend against external threats." As a result, according to the documentary evidence, ethnic Albanian Kosovars have returned to Kosovo by the hundreds of thousands and Albanians now enjoy an overwhelming majority of seats in Kosovo's democratically elected Assembly. While petitioners may well have a subjective fear of returning to Kosovo based on their experiences there, the record clearly suggests that those most likely to have faced persecution in Kosovo at the time the immigration courts reviewed this case were actually ethnic Serbs.

Petitioners did testify that life in Kosovo after the war was very difficult. Indeed, the documentary evidence shows that in 2001, "[u]nemployment among the predominantly ethnic Albanian population was estimated at 62 percent." And Albanians were still at risk of violence primarily because of criminal activity. Nevertheless, the record does not demonstrate that the economic deprivation and violence that petitioners could face if they returned to Kosovo would more likely than not be "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Consequently, petitioners cannot demonstrate the type of particularized threat of harm based on their ethnicity that is required to establish a well-founded fear of persecution. And because neither the testimony of the petitioners

6

nor the documentary evidence would compel any reasonable adjudicator to reach a conclusion contrary to that of the IJ, *see* 8 U.S.C. § 1252(b)(4)(B), the IJ's discretionary decision to deny asylum to petitioners on the facts of this case was not "manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D).

While a grant of asylum is discretionary, withholding of removal pursuant to Section 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3)(A), is mandatory if the applicant can demonstrate that there is a "clear probability" that he would be subject to persecution on account of one of the same five protected bases for establishing asylum. *Castellano-Chacon v. INS*, 341 F.3d 533, 545 (6th Cir. 2003). But an applicant seeking withholding of removal faces a more stringent burden of proof than one seeking asylum. *Daneshvar v. Ashcroft*, 355 F.3d 615, 625 (6th Cir. 2004). Because the record and the law supports the IJ's and BIA's determination that the petitioners are not eligible for asylum, they necessarily cannot satisfy the more stringent standard for withholding of removal. *Id*.

### III.

In the case that an alien qualifies as a refugee based on past persecution, but cannot establish a well-founded fear of persecution because of changed country conditions, the alien may still qualify for a discretionary grant of asylum. 8 C.F.R. § 208.13(b)(1)(iii). This so called "humanitarian" grant of asylum was first developed by the BIA in *Matter of Chen*, 20 I. & N. Dec. 16 (BIA 1989). In order to qualify for such a discretionary grant of asylum, the alien must either demonstrate "*compelling* reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution" or "establish[] that there is a reasonable possibility that he or she may suffer other *serious* harm upon removal to that country." 8 C.F.R. § 208.13(b)(1)(iii)(A) and (B) (emphasis added). The IJ's discretionary decision whether or not to grant relief pursuant to 8 C.F.R.

7

§ 208.13(b)(1)(iii) is reviewed for an abuse of discretion. *See Ngarurih v. Ashcroft*, 371 F.3d 182, 191 (4th Cir. 2004).

The IJ concluded that petitioners had not demonstrated that there was a reasonable possibility they would suffer "other serious harm" if they returned to Kosovo and also that petitioners failed to demonstrate "compelling reasons" for being unwilling to return because of past persecution. The IJ found it significant that petitioners came to the United States not out of a continuation of fear, but rather to reunite with family and because of economic concerns. More importantly, the IJ found that petitioners' claims under 8 C.F.R. § 208.13(b)(1)(iii) were belied by the fact that they continued living in Kosovo for one and a half years after they were persecuted by the Serbs. The BIA then added that the past persecution suffered by Petitioners "does not rise to the level contemplated by *Matter of Chen*, 20 I. & N. Dec. 16 (BIA 1989), so as to compel a grant of asylum despite changed country conditions." In ruling so, the immigration courts did not abuse their discretion.

With respect to 8 C.F.R. § 208.13(b)(1)(iii)(B), Mark Pergega suggested that any future in Kosovo would be grim because it would be difficult to find work and food. Rrok Pergega testified that life in Kosovo even after the Serbs left was a "[v]ery difficult life" and that there is "a lot of problems" there. But the petitioners submitted no evidence tending to prove that they would suffer any specific, much less "serious harm" upon returning to their homeland. The IJ and BIA therefore properly rejected petitioners' claims for humanitarian asylum under 8 C.F.R. § 208.13(b)(1)(iii)(B). 8 C.F.R. § 208.13(b)(1)(iii)(A) nevertheless allows an alien who has been persecuted but is in no danger of being persecuted or harmed in the future to avoid removal by showing "compelling reasons" for not being returned to his country. We have, however, suggested that in order to invoke this regulation, the past persecution suffered by an alien must be particularly severe. *See Potka v.*

8

*Ashcroft*, 2003 WL 21054683, at **2 (6th Cir. 2003). The four months of hard labor and starvation endured by petitioners was undoubtedly terrible, and their plight was made even more difficult as a result of the atrocities committed against their family members. Yet, we are convinced that the suffering inflicted upon these petitioners does not represent the type of extreme case necessary to justify the invocation of 8 C.F.R. § 208.13(b)(1)(iii)(A). *See Gonahasa v. INS*, 181 F.3d 538, 544 (4th Cir. 1999) ("Eligibility for asylum based on severity of persecution alone is reserved for the most atrocious abuse."); *see also Bucur v. INS*, 109 F.3d 399, 405 (7th Cir. 1997) (describing the "humanitarian asylum" regulation as designed for the case of the German Jews, the victims of the Chinese Cultural Revolution, survivors of the Cambodian genocide, and a few other such extreme cases); *Matter of Chen*, 20 I. & N. Dec. 16, 19-20 (BIA 1989) (humanitarian asylum justified for victim of Chinese Cultural Revolution whose father was tortured for eight years and killed, and who himself was interrogated, imprisoned, tortured, and starved for nine years, beginning when he was a child, leaving him physically debilitated).

## IV.

For the foregoing reasons, we AFFIRM the orders of the IJ and the BIA denying Mark and Rrok Pergega's claims for asylum and withholding of removal, as well as their claims for humanitarian asylum. Mark Pergega's petition for a stay of removal is DENIED.