NOT RECOMMENDED FOR PUBLICATION
File Name: 09a0058n.06
Filed: January 26, 2009

No. 08-3168

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ABOU SAMBIA, | ) | |
| | ) | |
| *Petitioner,* | ) | **ON APPEAL FROM THE BOARD** |
| | ) | **OF IMMIGRATION APPEALS** |
| v. | ) | |
| | ) | |
| MICHAEL B. MUKASEY, Attorney General, | ) | |
| | ) | |
| *Respondent.* | ) | |
| | ) | |

**BEFORE: COLE and COOK, Circuit Judges; EDMUNDS,[*] District Judge**

**EDMUNDS, District Judge.** Petitioner Abou Sambia seeks review of a decision by the

Board of Immigration Appeals (BIA), affirming the Immigration Judge's (IJ) denial of his

application for asylum under section 208(b)(1) of the Immigration and Nationality Act (INA), 8

U.S.C. § 1158(b)(1), withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. §

1231(b)(3), relief under the United Nations Convention Against Torture, and asylum on

humanitarian grounds under 8 C.F.R. § 1208.13(b)(1)(iii)(A). Because substantial evidence supports

the BIA's decision, we DENY the petition for review.

**I.**

---

[*]The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of
Michigan, sitting by designation.

Sambia is a native and citizen of the Central African Republic and a member of the Bororo ethnic group. He arrived in Memphis, Tennessee on September 29, 2002 and applied for asylum, withholding of removal, and relief under the Convention Against Torture on December 16. He claims that he suffered past persecution in the Central African Republic because of his political activity and will suffer future persecution or torture if required to return.

A.     **Asylum Application**

1.     **Sambia's Experience**

Sambia is a farmer, herder, and owner of a shop that he rents out. In 1992, he became an active member of the political party, Rassemblement Democratique Centrafrican (RDC), led by former President Andre Kolingba. Sambia educated herders and farmers living in the countryside about the RDC and conveyed their concerns to party officials. He also encouraged the Bororo community to vote for Kolingba in the 1993 presidential election. Many Bororo did so as a result of Sambia's efforts, but Kolingba lost the election to Ange-Felix Patasse.

On July 20, 2001, Sambia arrived home to find gendarmes waiting for him. The officers accused Sambia of having guns and distributing them to people in the countryside. Sambia denied the accusation and consented to a search of his home. The officers handcuffed Sambia while they searched for weapons. When they did not find any, they took him to the station where a member of Patasse's party told the gendarmes to use any means necessary to get Sambia to "tell the truth." Sambia was accused of supporting the rebels as a member of the RDC and was imprisoned without a proceeding. Sambia reports that he was interrogated and beaten every two days during his detention, was denied adequate food, and was ordered to bury prisoners who died in jail. On

December 24, 2001, gendarmes informed Sambia that they had expelled his wife and children from their home and destroyed his house, and that he would be killed by January.

On December 31, prison guards who were members of Sambia's ethnic group helped him escape. Sambia fled to Chad the next day, where he lived without permission of the Chadian government. His wife and five children eventually joined him there. Sambia was unable to work in Chad and did not apply for refuge there because of the tension between Chad and the Central African Republic. Upon hearing reports that Chad was returning refugees to the Central African Republic, Sambia traveled to Cameroon and then to Senegal with a smuggler. He eventually flew to the United States, arriving in New York on September 10, 2002.

### 2. Events in the Central African Republic

Sambia's application also includes the 2002 and 2003 U.S. State Department Country Reports on Human Rights Practices in the Central African Republic.[1] These provide the following useful background for understanding Sambia's testimony, as well as information about events following Sambia's departure.

In 1999, Ange-Feliz Patasse, leader of the MLPC party, was re-elected to another six-year term. On May 28, 2001, Andre Kolingba organized an unsuccessful coup against the Patasse government. According to Sambia, the Patasse government began arbitrarily arresting RDC members in the aftermath of the attempted coup. Its security forces "engaged in military reprisals, open executions, [and] the elimination of suspected rebel sympathizers, particularly members of the Yakoma ethnic group." Thousands of people fled the country, including Kolingba. Patasse

___

[1]The Court recognizes that these reports are now five years old. If circumstances have changed in the country since the BIA decision, the appropriate remedy is to file a motion to reopen removal proceedings pursuant to 8 C.F.R. § 1003.2(c)(3).

suspended the activities of the RDC from June to December 2001. In October of 2001, Patasse removed General Francois Bozize from his position as Chief of Staff of the Armed Forces upon suspicion of his complicity in the coup attempt. Bozize fled to Chad. On August 26, 2002, Kolingba and 22 others were sentenced to death in absentia. Most displaced persons, including the deputy of the RDC, returned home in 2002.

On October 25, 2002, General Bozize directed an attempted coup from abroad, but Patasse retained power. Bozize's forces killed numerous civilians during the coup attempt.[2]

On March 15, 2003, following a six-month rebellion, General Bozize overthrew the Patasse government in a military coup and declared himself President. Bozize appointed a transitional cabinet with members of all political parties and civil society. He also ordered military and security forces suspected of human rights abuses to disband. Bozize shared power with the NTC, a legislative body comprised of 96 representatives from all political parties.

On April 23, 2003, President Bozize granted amnesty to 800 people convicted of involvement in the 2001 coup attempt, including Andre Kolingba. Bozize encouraged thousands of exiles, including Kolingba and members of Kolingba's Yakoma ethnic group, to return. There were no reports that these people experienced government harassment upon their return. Six months later, the Bozize government held "a national reconciliation dialogue . . . intended to end years of armed conflict, coups, and ethnic rivalries" at which representatives of "different political, social, religious, and professional affiliations, adopted recommendations to be implemented by a government committee."

---

[2]In 2002, Patasse's presidency continued to be marked by human rights abuses, including arbitrary arrests and detentions, extra-judicial killings, and "government-tolerated executions of suspected bandits."

4

There were no reports of political killings by security forces or that Bozize prevented any political parties from operating in 2003, but there were reports of warrantless home searches, extrajudicial killing by security forces, arbitrary arrest and detention, and torture of suspects by police.

**B.      Removal Proceedings and IJ Decision**

Sambia's case was referred to an IJ, who issued a Notice to Appear on March 20, 2003. At a June 4, 2003 hearing, Sambia conceded removability and renewed his application for asylum, withholding of removal, and relief under the Convention Against Torture. The hearing was continued until February 16, 2005.

At the February 16 hearing, the IJ noted, and Sambia's counsel agreed, that Sambia "seek[s] asylum based upon mistreatment that he suffered at the hands of a government that is now out of power." The IJ questioned Sambia about Bozize's April 2003 amnesty:

> Q.      If Patasse is out of power and Bozize is in power and Bozize is encouraging Kolingba and his followers to return to the Central African Republic, why is it not safe for you to return to the Central African Republic?
> A.      I know Bozize how he is. He was the first one who initiated a coup against Kolingba with (indiscernable). They were the first one who did a coup to give the power to Patasse. And this was in '82.
> Q.      Well, sir, you haven't answered my question. Do you have any evidence to show beyond your testimony that it is unsafe for somebody who supported Kolingba to return to the Central African Republic?
> A.      Right now I know that if I go back it's not safe for me because Bozize himself he was the chief of the army at the time when they were mistreated. He knew everything about that.
> Q.      Are you saying that Bozize knew you?
> A.      He know me because we were all in the same country.

Sambia testified that he did not have an arrest warrant or any other document indicating that authorities in the Central African Republic were looking for him.

Sambia explained why he did not want to return to the Central African Republic: "I was humiliated, mistreated, and beaten. If I return back, it might be the same or worse." When asked if he trusted Bozize's amnesty, Sambia replied, "I know he has said that. On (indiscernible) he said that but if they come there what he's doing is quite different from the speech." Sambia testified that he does not know anyone who has returned to the Central African Republic. The following exchange then occurred between the IJ and Sambia's counsel:

> Q. Well let me ask you, beyond the self-serving testimony of the respondent, do you have any disinterested witnesses or anything to contradict the Human Rights Reports? . . . I have to determine the objective quality of his fear and to do that I want to look beyond his self-serving testimony.
>
> . . .
>
> A. But, no. To answer your question, we don't have anything.

After hearing this testimony, the IJ denied Sambia's application and ordered him removed. In a written opinion, the IJ dismissed Sambia's application for asylum as untimely but noted that Sambia would be ineligible for asylum even if his application had been submitted within the one-year deadline. The IJ found that Sambia had failed to prove past persecution due to "a paucity of corroboration" and the IJ's "grave doubts" about Sambia's testimony. The IJ found no nexus between Sambia's arrest and one of the five protected grounds, noting that the government had a right to investigate a potential coup. The IJ also found that Sambia had failed to prove a well-founded fear of future persecution due to changed country conditions. The IJ concluded that Sambia was not entitled to a favorable exercise of discretion because he could continue living in Chad. The IJ also found Sambia ineligible for humanitarian asylum since he had failed to prove past persecution. Finally, the IJ denied Sambia's claims for withholding of removal under the INA and the Convention

6

Against Torture because he did not prove that it is more likely than not that he would be persecuted or tortured in the future. Sambia filed a timely notice of appeal to the BIA.

### C.    Appeal and BIA Decision

On May 5, 2006, the BIA issued an opinion affirming the IJ. On August 3, 2006, Sambia filed a motion to reopen the BIA proceedings due to ineffective assistance of counsel, which was granted. The BIA vacated its May 5 opinion and issued its final opinion on January 28, 2008. It found no basis for the IJ's conclusion that Sambia's asylum application was untimely. The BIA stated that it need not decide whether the IJ was correct in concluding that Sambia did not experience past persecution because it "concur[red] with the Immigration Judge that the preponderance of the evidence demonstrates that there has been a 'fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution.'" The BIA based this finding on the fact that "the Patasse government is no longer in power" and "an amnesty was instituted for those who had opposed the Patasse government." The BIA held that Sambia's persecution was not severe enough to warrant a grant of asylum in the absence of a well-founded fear of future persecution. The BIA also concluded that having not met the burden of proof required for asylum, Sambia was also ineligible for withholding of removal or relief under the Convention Against Torture. Sambia filed a timely petition for review.

## II.

Sambia raises three issues on appeal. He claims the BIA erred by: (1) denying his claims for asylum, withholding, and relief under CAT for lack of corroboration[3]; (2) finding a fundamental

---

[3]It was the IJ who noted Sambia's lack of corroboration of past persecution. We decline to address this since the BIA *assumed* past persecution. We treat this claim as a petition for review of the denial of Sambia's application for asylum and withholding of removal.

7

change in country conditions sufficient to rebut his presumption of a well-founded fear of future persecution; and (3) finding Sambia ineligible for humanitarian asylum.

### A.      Asylum under the INA

Under the INA, the Attorney General has discretion to grant asylum to a "refugee." *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004) (quoting 8 U.S.C. § 1158(b)). Asylum applications are subject to a two-part inquiry: (1) whether the applicant qualifies as a "refugee" and (2) whether the applicant "merits a favorable exercise of discretion." *Id.* (quoting *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994)). An applicant meets the definition of a "refugee" if he "is unable or unwilling to return to his home country 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Id.* (quoting 8 U.S.C. § 1101(a)(42)(A)).

The asylum applicant bears the burden of proving that he qualifies as a refugee "either because he has suffered actual past persecution or because he has a well-founded fear of future persecution." *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998) (quoting 8 C.F.R. § 208.13(a)-(b)). An applicant who establishes that he has suffered past persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion" is presumed to have a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1).

The government may rebut this presumption, however, if it establishes by a preponderance of the evidence that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality." C.F.R. § 208.13(b)(i)(A). "The INS must do more than show that circumstances in the country have fundamentally changed; the INS must also show that such change negates the particular applicant's

well-founded fear of persecution." *Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003); *Mapouya v. Gonzales*, 487 F.3d 396, 412 (6th Cir. 2007); *see also Chand v. INS*, 222 F.3d 1066, 1079 (9th Cir. 2000) (rebutting presumption "requires an individualized analysis that focuses on the specific harm suffered and the relationship to it of particular information contained in the relevant country reports").

If the government rebuts the presumption, the applicant "'must demonstrate a well-founded fear of future persecution notwithstanding' the changed country conditions." *Mapouya*, 487 F.3d at 412 (quoting *Liti v. Gonzales*, 411 F.3d 631, 639 (6th Cir. 2005)); *see also Sy v. Mukasey*, 278 F. App'x. 473, 475 (6th Cir. 2008) (citing *Mikhailevitch*, 146 F.3d at 389). An applicant proves a well-founded fear of future persecution if he demonstrates that "(1) [he] has a fear of persecution in [his] country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) there is a reasonable possibility of suffering such persecution if [he] were to return to that country; and (3) [he] is unable or unwilling to return to that country because of such fear." *Mikhailevitch*, 146 F.3d at 389. This fear "must be both subjectively genuine and objectively reasonable." *Id.* That is, the applicant must "actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an 'objective situation' under which his fear can be deemed reasonable." *Perkovic*, 33 F.3d at 620-21 (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987)). An asylum applicant "need not demonstrate that he will probably be persecuted if returned because '[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.'" *Liti*, 411 F.3d at 637 (quoting *Cardoza-Fonseca*, 480 U.S. at 431).

1.    **Standard of Review**

9

Because the BIA issued its own opinion, we review the BIA opinion rather than that of the IJ. *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007). This Court reviews the BIA's findings of facts, including "whether an alien qualifies as a refugee" and "the determination that [a] petitioner failed to establish eligibility for asylum" under "the substantial evidence standard." *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006); *Singh v. Ashcroft*, 398 F.3d 396, 400 (6th Cir. 2005). "Under this deferential standard, we may not reverse the Board's determination simply because we would have decided the matter differently." *Mikhailevitch*, 146 F.3d at 388. Rather, the BIA's findings are "'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Singh*, 398 F.3d at 400 (internal citations omitted); *see also Mikhailevitch*, 146 F.3d at 388 (BIA decision "'must be upheld'" if "'supported by reasonable, substantial, and probative evidence on the record considered as a whole'" (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (internal citation omitted))). Any issues of law are reviewed *de novo*. *Ramaj*, 466 F.3d at 527.

### 2. Sambia's Petition

Sambia asserts that the BIA erred in finding that he had no well-founded fear of future persecution in light of changed country conditions.[4] Substantial evidence supports the BIA's finding that changed country conditions rebut the presumption of a well-founded fear of future persecution for Sambia in the Central African Republic. The U.S. State Department Country Report for 2003 reveals that the Patasse government responsible for Sambia's past persecution was overthrown in a coup. *See, e.g.*, *Liti*, 411 F.3d at 639 (collapse of communist regime that persecuted petitioners was "sufficient change in country conditions to rebut th[e] presumption"); *Mullai v. Ashcroft*, 385 F.3d

---

[4]Since the BIA assumed that Sambia experienced past persecution, the IJ's finding that Sambia failed to meet his burden on that claim is not at issue in this appeal.

635, 639 (6th Cir. 2004) (replacement of government that persecuted petitioner constituted changed conditions to rebut presumption); *see also id* (noting that this court has upheld reliance on State Department reports in recognition that they "'are generally the best source of information on conditions in foreign nations.'" (internal citation omitted)). The Country Reports also reveal that the new government, headed by Francois Bozize, issued an amnesty to the head of Sambia's RDC party and his followers and that "there were no reports that they experienced government harassment." *See Sy*, 278 F. App'x at 476 (government rebutted presumption of future persecution when new government "delivered widespread amnesty" to former President's political enemies); *Kajosevic v. Gonzales*, 176 F. App'x 145, 147 (2d Cir. 2006) (government rebutted presumption of future persecution when changed conditions included amnesty to individuals like petitioner who fled country to avoid military service); *see also Ogayonne v. Mukasey*, 530 F.3d 514, 521-22 (7th Cir. 2008) (denying Kolingba's sister-in-law withholding of removal to Central African Republic in light of overthrow of Patasse government and subsequent granting of amnesty to Kolingba and his followers).

Sambia points to these same country reports to argue that the situation has not changed: he notes that they also report that "citizens . . . have no peaceful means to change their government," and "security forces continue to abuse their own citizens." (Pet'r's Br. at 17.) But these statements describe "the type of general civil disorder and lawlessness to which anyone living in [the Central African Republic] would be exposed" and do not establish persecution based on a protected ground. *Mullai*, 385 F.3d at 639; *see also Singh v. INS*, 134 F.3d 962, 967 (9th Cir. 1998) (an applicant "'must show that [he] is at particular risk – that [his] predicament is appreciably different from the dangers faced by [his] fellow citizens.'" (internal citation omitted)). We hold that the BIA's finding that the

11

government rebutted Sambia's presumption of a well-founded fear of future persecution was based on substantial evidence.

We must next assess whether the BIA erred in concluding that Sambia failed, in the absence of a presumption, *to prove* a well-founded fear of future persecution. Sambia's statements in his asylum application and before the IJ suffice to demonstrate that his fear is "subjectively genuine" but do little to demonstrate that his fear is "objectively reasonable" in light of changed country conditions. Sambia submitted two letters written by individuals still living in the Central African Republic about then-current conditions, one written by his friend Diallo Ally and one by his father-in-law. Both warn Sambia not to return. The letter from Ally, however, dates from before Patasse's government was overthrown and, thus, does not support his claim. *See Sy*, 278 F. App'x at 477 ("giv[ing] little weight" to letter warning of dangers in country when dated almost a year before coup).

Sambia's best evidence is the June 2003 letter, in which his father-in-law reports narrowly escaping "being lynched by municipal agents" for trying to collect rent on Sambia's tables in the market. While this letter raises concerns about the situation in the Central African Republic, it does not "'offer reasonably specific information showing a real threat of individual persecution'" of Sambia should he return. *Mapouya*, 487 F.3d at 412 (internal citations omitted); *see id.* at 411-12 (petitioner proved well-founded fear of persecution notwithstanding changed country conditions with reports from individuals in country that "rival factions . . . continue to persecute their (political) opposition, especially on ethnic grounds," that those who persecuted petitioner "are still looking for [him] in the Congo," and that petitioner's "name is on the wanted list at the Ministry of the Interior."). Given Sambia's lack of corroboration, substantial evidence supports the BIA's finding that Sambia failed to prove a well-founded fear of future persecution in light of changed country conditions. *See*

12

*Liti*, 411 F.3d at 637 (applicants failed to meet burden of proving future persecution in light of Government having demonstrated a fundamental change in country conditions when "they presented no corroborating evidence though it was reasonably available."); s*ee also Dorosh v. Ashcroft*, 398 F.3d 379, 383 (6th Cir. 2004) (agreeing with BIA that "corroborative evidence of Petitioner's . . . fear of future persecution" in form of "letters from her girlfriends in the Ukraine documenting the danger Petitioner would face if she returned" "could be 'reasonably expected'").

B.      **Withholding of Removal Under the INA**

Sambia also argues that the BIA erred in finding petitioner ineligible for withholding of removal under section 241(b)(3) of the INA.  While the granting of asylum is discretionary, "[w]ithholding of removal is mandatory if an alien establishes that his 'life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion.'"  *Pilica*, 388 F.3d at 951 (quoting 8 C.F.R. § 1208.16(b)).  "An application seeking withholding of deportation faces a more stringent burden of proof than one for asylum."  *Mikhailevitch*, 146 F.3d at 391 (citing *Cardoza-Fonseca*, 480 U.S. at 431-32).  In order to qualify for withholding, Sambia "must establish that there is a clear probability that he will be subject to persecution if forced to return to the country of removal."  *Pilica*, 388 F.3d at 951 (citing *INS v. Stevic*, 467 U.S. 407, 413 (1984)).  A showing of clear probability requires demonstrating that "'it is more likely than not' that [Sambia] will be persecuted upon return."  *Liti*, 411 F.3d at 641 (quoting 8 C.F.R. § 1208.16(b)(2)).  "Because substantial evidence supports the [BIA's] determination that [Sambia] is ineligible for asylum, it therefore follows that he cannot satisfy the more stringent standard for withholding of deportation."  *Mikhailevitch*, 146 F.3d at 391.

C.      **Relief Under the Convention Against Torture (CAT)**

13

Sambia also petitions for review of the BIA's denial of withholding under CAT. Respondent argues that Sambia waived his CAT claim by failing to brief it. Sambia's petition states in a heading that the BIA erred in finding Sambia ineligible for relief under CAT but does not brief this issue. Even if Sambia had not waived this claim, the BIA did not err in finding him ineligible for relief under CAT.

The Convention provides that, "No State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Feb. 4, 1985, 23 I.L.M. 1027. In order for Sambia to prevail on this claim, he must prove that "'it is more likely than not that he . . . would be tortured if removed.'" *Liti*, 411 F.3d at 641 (quoting 8 C.F.R. § 1208.16(c)(2)). "Because [Sambia] failed to establish eligibility for asylum, [he] also cannot meet the heightened requirements for relief under CAT." *Id.*; *cf. Namo v. Gonzales*, 401 F.3d 453, 458 (6th Cir. 2005) (petitioner who experienced torture and has warrant outstanding for his arrest met burden of proof for relief under CAT).

## D.      Asylum on Humanitarian Grounds

Sambia also petitions for review of the BIA's denial of his request for asylum on humanitarian grounds. "In the absence of a well-founded fear of future persecution, an alien may still be entitled to a discretionary grant of asylum if he or she 'has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution.'" *Liti*, 411 F.3d at 641 (quoting 8 C.F.R. § 1208.13(b)(1)(iii)(A)). Despite changed circumstances, "asylum should be granted if the past persecution was so severe that returning the alien to his or her native country would be inhumane." *Klawitter v. INS*, 970 F.2d 149, 153 (6th Cir. 1992); *see Matter of*

14

*Chen*, 20 I & N Dec. 16, 19-21 (BIA 1989) (granting humanitarian asylum to applicant after Cultural Revolution in China had ended because he had been locked in his home at age eight and subjected to years of physical and psychological torture).

Sambia's past persecution, including a five-month detention during which he was interrogated and beaten, and the destruction of his home, was, by all standards, atrocious. But this Court has made clear that "'severe persecution'" giving rise to humanitarian asylum "is reserved for extreme cases, such as 'for the case of the German Jews, the victims of the Chinese 'Cultural Revolution,' [and] survivors of the Cambodian genocide.'" *Hana v. Gonzales*, 157 F. App'x 880, 884 (6th Cir. 2005) (citing *Bucur v. INS*, 109 F.3d 399, 405 (7th Cir. 1997)). In *Hana*, an applicant was denied humanitarian asylum when he "was, at most, subjected to three detentions, none of which lasted longer than two months, and "[h]e alleged no psychological torture, and . . . had only missing teeth and bruises on his return from his imprisonment." *Id*. at 884. Similarly, in *Pergega-Gjonaj v. Gonzales*, 128 F. App'x 507, 508-09 (6th Cir. 2005), the applicants' past persecution was "not sufficiently severe to warrant a humanitarian grant of asylum" even though it included four months of forced labor and the murder and rape of several of their family members. Because Sambia's persecution was not as severe as the persecution experienced by asylum applicants in *Matter of Chen*, *Hana*, or *Pergega-Gjonaj*, the BIA's denial of humanitarian asylum was not an abuse of discretion. *See Pergega-Gjonaj*, 128 F. App'x at 512 (applying abuse-of-discretion standard).[5]

**III.**

_____

[5]An applicant who has only suffered past persecution may also qualify for asylum if he establishes that "there is a reasonable possibility that or she may suffer other serious harm upon removal to that country." 8 C.F.R. § 1208.13(b)(1)(iii)(B). The BIA also did not err in finding that Sambia "ha[d] not made such a showing."

15

For the foregoing reasons, we DENY the petition for review.