08-4820-ag
Caranza-Fuentes v. Holder

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2009

(Argued: December 9, 2009         Decided: March 2, 2010)

Docket No. 08-4820-ag

_____

MILTON RONALDO RODAS CASTRO, MARIA LUISA CARRANZA-FUENTES,

*Petitioners,*

— v.—

ERIC H. HOLDER, JR., UNITED STATES ATTORNEY GENERAL,[*]

*Respondent.*

_____

B e f o r e:

LEVAL, HALL AND LYNCH, *Circuit Judges.*

_____

Petitioners Milton Ronaldo Rodas Castro and his wife, Maria Luisa Carranza-

Fuentes, petition for review of that portion of a final order of the Board of Immigration

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Eric
H. Holder, Jr., is automatically substituted as respondent in this case.

Appeals affirming the decision of an Immigration Judge denying their applications for asylum. Because the agency's treatment of petitioners' claim of political persecution based on Rodas's reporting of official corruption to an international human rights organization was based on substantial errors, we grant the petition and remand the case to the BIA for further consideration.

VACATED AND REMANDED.

_____

ANNE PILSBURY (Miwako Dai and Heather Y. Axford, *on the brief*), Central American Legal Assistance, Brooklyn, New York, *for Petitioners*.

JAMIE M. DOWD (Michael F. Hertz, Acting Assistant Attorney General Civil Division, and Ernesto H. Molina, Jr., Assistant Director, *on the brief*), Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, DC, *for Respondent*.

_____

GERARD E. LYNCH, *Circuit Judge*:

In September 2005, Milton Ronaldo Rodas Castro ("Rodas"), a native and citizen of Guatemala and a former police officer there, applied for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158, 1231(b)(3), and for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85; see 8 C.F.R. §§ 1208.16-18 (implementing the CAT), alleging retaliation and threats on his life by the Guatemalan police following his reports of official corruption to an international human rights organization. Rodas's

wife, Maria Luis Carranza-Fuentes ("Carranza"), also a native and citizen of Guatemala, independently applied for asylum, withholding of removal and relief under the CAT based on the same factual predicate, and their cases were consolidated in the Immigration Court. Carranza is also listed as a derivative applicant on Rodas's application.[1]

On September 10, 2008 the Board of Immigration Appeals ("BIA"), affirmed a January 8, 2007 decision of Immigration Judge ("IJ") Vivienne E. Gordon-Uruakpa, granting Rodas and Carranza relief under the CAT, but denying their requests for asylum and withholding of removal under the INA. In re Caranza & Rodas, Nos. A097 909 250 & A099 423 445 (B.I.A. Sept. 10, 2008), aff'g Nos. A097 909 250 & A099 423 445 (Immig. Ct. N.Y. City Jan. 8, 2007). At issue in this appeal is the portion of the BIA's order holding petitioners ineligible for asylum upon a finding that Rodas failed to establish a sufficient nexus between a protected ground and the harm he encountered and

---

[1] Under the derivative asylum provision, "[a] spouse . . . of an alien who is granted asylum . . . may, if not otherwise eligible for asylum . . . , be granted the same status as the alien if accompanying, or following to join, such alien." 8 U.S.C. § 1158(b)(3)(A). Although Carranza independently applied for asylum based on persecution on account of political opinion and membership in a social group, she has never – either before the agency or here – identified either her political opinion or the social group to which she purports to belong. Indeed, Carranza's Form I-589 application does not reference any of her own political beliefs, but instead seeks relief "because of [Rodas's] desire to change the government." As the substantive focus in petitioners' joint brief on appeal is exclusively on Rodas's eligibility for relief, for the purposes of this appeal, we consider Carranza's claim for asylum only insofar as she may be eligible as a derivative asylee on Rodas's application, as we read the IJ and BIA to have done implicitly.

3

will encounter if removed to Guatemala.[2]  We find that the agency erred in concluding that the danger Rodas encountered lacked any political dimension, because the agency failed to properly consider the relevant context in which Rodas's claim arises and, in so doing, misconstrued the concept of political opposition.  Accordingly, we grant the petition and remand the case for further consideration.

## BACKGROUND

### I.      Rodas's Claim of Persecution

In 1996, with the signing of various Peace Accords, Guatemala emerged from thirty-six years of civil war under the leadership of President Álvaro Arzú of the Partido de Avanzada Nacional ("PAN").  Following the implementation of the Peace Accords, among other changes, President Arzú abolished the Guatemalan National Police and Treasury Police, which had been run by the military, and established in their place the Guatemalan National Civil Police Force ("PNC").  According to Rodas's unrebutted testimony – as well as an affidavit submitted by Jorge Nowell Enriquez, a former

---

[2] Although petitioners mention in their reply brief that they are challenging the denial of their claims for both asylum and withholding of removal under the INA, petitioners have waived any challenge to the denial of their § 1231(b)(3) withholding of removal claims because their petition for review and opening brief were explicitly limited to challenging the agency's asylum decision.  Cf. Evangelista v. Ashcroft, 359 F.3d 145, 155 n.4 (2d Cir. 2005) ("We will not consider an argument raised for the first time in a reply brief.") (internal brackets and quotation marks omitted).  Moreover, given the agency's grant of withholding of removal under the CAT, petitioners have nothing to gain by continuing to pursue withholding of removal under the INA; as petitioners noted in their brief to the BIA, at this point they can benefit only by obtaining asylum, as there is no practical difference in the relief afforded between withholding of removal under the INA and under the CAT.

4

Guatemalan political leader – as part of this transformation, President Arzú removed many corrupt officers from power. Against this backdrop, Rodas joined the PNC in 1998 as part of the first wave of new post-Peace Accord officers, because it "had a good image" and he wanted to contribute to his community.

In 2000, however, Present Arzú and the PAN were succeeded in power by President Alfonso Portillo of the Frente Republicano Guatemalteco ("FRG"). President Portillo was closely aligned with a former military dictator and, according to Rodas's and Enriquez's unrebutted testimony, under President Portillo's command, many corrupt elements from the pre-Peace Accord regime were reinstated. Following President Portillo's assumption of power, problems with corruption in Guatemala reportedly deepened. As noted by a 2003 report of the United States Drug Enforcement Administration provided as part of Rodas's asylum application, in that environment, "[r]ampant corruption permeate[d] all levels of law enforcement, the judiciary, military and other governmental agencies in Guatemala." Drug Enforcement Admin., U.S. Dep't of Justice, Drug Intelligence Brief, Country Brief: Guatemala 2, 7 (2003) (hereinafter "DEA Drug Intelligence Brief").

In August 2001, Rodas's supervisor, Second Officer Edgar Noberto Hernandez Revolorio, assigned him to investigate suspected leaders of drug trafficking groups. Rodas did so, and presented his findings to Revolorio. The following month, while Rodas and another officer were patrolling the streets, they witnessed Revolorio and

5

another supervisor, First Officer Rubelio Navas, engaged in a cocaine transaction with one of the men Rodas had been assigned to investigate and about whom Rodas had provided information to Revolorio.

Upon the arrival of Rodas and his partner, Revolorio and Navas passed off the transaction as official police business and instructed the subordinate officers to return to the police station. They did so, but Rodas dismissed the suggestion that Revolorio and Navas were engaged in an undercover sting operation because, as Rodas testified, the Guatemalan police did not engage in such transactions. Accordingly, upon returning to the station Rodas immediately called the regional police commissioner, Juan Francisco Jacinto Ruiz, who was superior to both Revolorio and Navas, and reported what he had seen. Jacinto Ruiz told Rodas not to worry and that he would take care of the situation.

The following day, Revolorio removed Rodas from patrol duties, prohibited him from making phone calls, and suspended him. Several days later, on September 21, Rodas went to the United Nations Human Rights Verification Mission in Guatemala ("MINUGUA") – a human rights organization set up under United Nations auspices as part of the implementation of the Peace Accords to monitor the peace process and human rights issues – to report the drug trafficking activities of his police supervisors. Rodas explained that he sought to report the incident to MINUGUA "because it was an organization that was created so that human rights would be respected, [that] has been guarding or watching the human rights not just of police officers but all of the citizenry in

6

general," and because Rodas "like[s] to be a man who's honest and correct." Rodas's partner, who also witnessed the drug transaction, did not want to put himself in danger by making such a report and did not accompany Rodas to MINUGUA.

MINUGUA workers warned Rodas that reporting such a blatant act of corruption was extremely dangerous. Accordingly, on MINUGUA's advice, Rodas's official report was limited to several lesser incidents of malfeasance within the PNC, which would enable MINUGUA to open an investigation and thereby lead them to the more serious issues Rodas presented while minimizing the risk to Rodas.

Police commissioner Jacinto Ruiz was unhappy that Rodas made this report to MINUGUA and instructed him to rescind it. MINUGUA officers cautioned Rodas not to accede to Jacinto Ruiz's demands because if Rodas's complaint were withdrawn there would be no evidence of Rodas's actions in the event something were to happen to him. Rodas decided not to withdraw the complaint and so informed Jacinto Ruiz.

Thereafter, Rodas's life took a drastic turn for the worse, exemplified by his effective ouster from the PNC, several attempts on his life, and his brother's murder. Initially, Rodas's work duties were reduced and he was assigned to security detail at the hospital. One day in October 2001, while Rodas was guarding a prisoner, three men, one carrying a pistol, came looking for Rodas. The armed man said that they were sent "from the above" because Rodas did not behave, and said something to the effect of "we're coming for you now that you won't join us." Rodas summoned another officer for help,

7

and, after a scuffle, Rodas and his partner were able to arrest two of the three men. Rodas and his partner brought the arrestees to the police station and reported the incident. A subsequent background check revealed that one of the arrestees was a fellow PNC officer from another unit. Charges against these men never went forward, however, for when Rodas appeared in court to present charges as the arresting officer, he discovered that his assailants had been released and replaced by two innocent homeless men.

Following this event, Rodas was given six months of disability leave to tend to his ankle, which had fractured during the hospital fight. Rodas and Carranza moved to the town where Carranza grew up and stayed with various relatives while Rodas received physical therapy. Over the next several months, Rodas was followed on various occasions by people driving motorcycles and cars and by uniformed police officers, and was told that armed men came looking for him at his wife's parents' house and at the hospital where he was being treated. PNC officers also visited Rodas's parents in another town, informing Rodas's parents that they had a message for Rodas that could only be delivered to him personally.

Rodas's suspicions that the PNC were out to get him were confirmed by his colleague – the same officer who witnessed the cocaine transaction with Rodas, and who still worked for the PNC – who warned Rodas not to return to police duty because the PNC were setting a trap to kill him. At some point, Rodas encountered two men who said they were from "the above," and asked when Rodas would return to work. Terrified that

the PNC had finally tracked them down, Rodas and Carranza moved to another part of the country.

In August 2003, Rodas's sister-in-law received a telegram directing Rodas to come to the police station to sign formal resignation papers. MINUGUA workers accompanied Rodas for protection. Upon review of the papers, Rodas saw that they falsely accused him of stealing police equipment after his suspension. He therefore declined to sign anything, fearing that these documents would be used as an excuse to detain him.

The PNC made another attempt on Rodas's life in December 2003. As Rodas was driving home one day, one of his former PNC colleagues opened fire, striking Rodas's car several times, but missing Rodas. Rodas returned home and told his wife what happened and the two fled to another part of the country that night. For the next several months, Rodas and Carranza moved frequently, but there was always some sign of danger or suspicious people searching for them and they realized that they needed to leave Guatemala.

Rodas and Carranza fled Guatemala in August 2004, staying briefly in Mexico en route to the United States. While in Mexico, Rodas learned from his brother that the PNC were still looking for him. Rodas's brother told the PNC to give up as Rodas was no longer in the country. Several weeks later, Rodas's brother was shot in the head and killed. Rodas believes that the PNC is responsible for his brother's murder.

Rodas and Carranza entered the United States separately in 2004. In January 2005,

9

Carranza filed for asylum, withholding of removal under the INA and relief under the CAT; Rodas applied for the same relief in September 2005. Rodas's family told him that PNC officers continue to look for him and have said that he will be killed if he returns to Guatemala.

**II.    Prior Proceedings**

Rodas testified before the IJ in support of his and Carranza's applications and the IJ issued an oral decision at the conclusion of the merits hearing. In re Caranza & Rodas, Nos. A097 909 250 & A099 423 445 (Immig. Ct. N.Y. City Jan. 8, 2007). The IJ found Rodas credible and, based on his testimony – coupled with background documentary evidence detailing high levels of corruption in Guatemala and PNC involvement in extrajudicial killings, torture and other abuse – granted Rodas and Carranza relief under the CAT, finding it more likely than not that they would be tortured if they were removed to Guatemala. Id. at 13-15. Though recognizing the reality and severity of the past threats Rodas had received and that were likely to continue to plague the family if they returned to Guatemala, the IJ denied Rodas's and Carranza's applications for asylum and withholding of removal under the INA, concluding that they had "failed to establish a nexus between [Rodas's] experience and any of the five enumerated grounds" (namely, race, religion, nationality, membership in a particular social group, or political opinion) – a requirement to obtain either asylum or withholding of removal under the INA, but not to obtain relief under the CAT. Id.

10

More specifically, citing I.N.S. v. Elias-Zacarias, 502 U.S. 478 (1992), the IJ concluded that Rodas "was not deemed politically offensive," but rather that he "was sought after because he did not join corrupt police officials." Id. at 12. While recognizing that Rodas was also targeted because he reported corruption within the PNC, the IJ held that, as a police officer, Rodas assumed the risk of the harm he suffered at the hands of "rogue police officers" and that accordingly, the harm he suffered was not on account of his political opinion. Id. at 12-13, citing Matter of Fuentes, 19 I. & N. Dec. 658 (BIA 1988). Finally, the IJ concluded that because Rodas's past experience lacked a nexus to a protected ground, so too did Rodas's fear of future persecution. Id. at 15. Accordingly, the IJ found Rodas ineligible for either asylum or withholding of removal under the INA.

On September 10, 2008, the BIA adopted and affirmed the IJ's decision. In re Carranza & Rodas, Nos. A097 909 250 & A099 423 445 (B.I.A. Sept. 10, 2008). The BIA agreed with the IJ's conclusion that Rodas failed to "demonstrate[] that any harm he encountered or may encounter is . . . on account of his political opinion." Id. The BIA also addressed Rodas's claim of persecution on account of his membership in a particular social group, an issue the IJ did not address. The BIA rejected that argument, however, finding that the social group on account of which Rodas claimed persecution – defined as "Guatemalan policemen who have registered complaints against official corruption" – lacked the requisite social visibility. Id. Additionally, noting that the REAL ID Act's

"one central reason" standard governs Rodas's case, the BIA held that Rodas had not demonstrated that membership in any social group was "one central reason" for Rodas's fear of persecution. Id.

**DISCUSSION**

**I.    Legal Standards**

"Where, as here, the BIA has adopted and supplemented the IJ's decision, we review the decision of the IJ as supplemented by the BIA." Delgado v. Mukasey, 508 F.3d 702, 705 (2d Cir. 2007). Legal issues, and the application of law to fact, are reviewed de novo. Roman v. Mukasey, 553 F.3d 184, 186 (2d Cir. 2009). "[B]ecause the IJ found [Rodas] to be credible, we treat the events []he experienced in the past as undisputed facts." Delgado, 580 F.3d at 705. The agency's findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also Xu Duan Dong v. Ashcroft, 406 F.3d 110, 111 (2d Cir. 2005). Accordingly, we review such findings under the substantial evidence standard, which requires that they be supported by "reasonable, substantial and probative evidence in the record when considered as a whole." Iouri v. Ashcroft, 487 F.3d 76, 81 (2d Cir. 2007) (internal quotations marks omitted). "This standard 'requires a certain minimum level of analysis from the IJ and BIA,' as well as 'some indication that the IJ considered material evidence supporting a petitioner's claim.'" Delgado, 508 F.3d at 705 (internal bracket omitted), quoting Poradisova v. Gonzales, 420 F.3d 70, 77 (2d Cir.

12

2005). "We will vacate and remand for new findings . . . if the agency's reasoning or its factfinding process was sufficiently flawed." Xiao Kui Lin v. Mukasey, 553 F.3d 217, 220 (2d Cir. 2009).

Asylum is a discretionary form of relief available to certain aliens who qualify as "refugees" within the meaning of the INA. 8 U.S.C. § 1158(b)(1)(A). In relevant part, the INA defines a "refugee" as a person who is unable or unwilling to return to his or her native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). For applications filed after May 11, 2005, such as Rodas's, the REAL ID Act of 2005 places the burden on the asylum applicant to establish a sufficiently strong nexus to one of the protected grounds by demonstrating that "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." REAL ID Act § 101(a)(3), Div. B of Pub. L. No. 109-13, 119 Stat. 302, 303 (May 11, 2005), codified at 8 U.S.C. § 1158(b)(1)(B)(i); see also REAL ID Act § 101(h)(2), 119 Stat. at 305 (making the Act's provisions applicable to applications filed on or after the date of enactment).

The only issue here is the agency's finding that Rodas failed to satisfy this nexus requirement linking his fears and the harms he suffered to either his political opinion or his membership in a particular social group.

13

**II. Application**

To establish persecution "on account of" political opinion under § 1101(a)(42), an asylum applicant must demonstrate that the persecution arises from his own political opinion, actual or imputed. Elias-Zacarias, 502 U.S. at 482; accord, Koudriachova v. Gonzales, 490 F.3d 255, 263 (2d Cir. 2007). "The applicant must also show, through direct or circumstantial evidence, that the persecutor's motive to persecute arises from the applicant's political belief." Yueqing Zhang v. Gonzales, 426 F.3d 540, 545 (2d Cir. 2005), citing Elias-Zacarias, 502 U.S. at 483.

Within this framework, as we and several of our sister circuits have held, opposition to government corruption may constitute a political opinion, and retaliation against someone for expressing that opinion may amount to political persecution. See, e.g., Manzur v. U.S. Dep't of Homeland Sec., 494 F.3d 281, 294 (2d Cir. 2007); Yueqing Zhang, 426 F.3d at 547-48; Osorio v. I.N.S., 18 F.3d 1017, 1030-31 (2d Cir. 1994); see also Hayrapetyan v. Mukasey, 534 F.3d 1330, 1336 (10th Cir. 2008) (finding that actions "taken in retaliation for [petitioner's] threatened exposure of government corruption. . . . alone can support a claim of political persecution"); Musabelliu v. Gonzales, 442 F.3d 991, 995 (7th Cir. 2006) ("Whistle-blowing about public corruption can be a form of political opinion."); Grava v. I.N.S., 205 F.3d 1177, 1181 (9th Cir. 2000) ("[W]here the whistle blows against corrupt government officials, it may constitute political activity sufficient to form the basis of persecution on account of political opinion."); Marku v.

14

Ashcroft, 380 F.3d 982, 986 (6th Cir. 2004) (collecting cases holding that, under certain circumstances, opposition to government corruption may constitute a political opinion). Although opposing corruption for purely self-interested reasons may lack a political motivation, "opposition to endemic corruption . . . may have a political dimension when it transcends mere self-protection and represents a challenge to the legitimacy or authority of the ruling regime." Yueqing Zhang, 426 F.3d at 547-48. In considering whether opposition to corruption constitutes a political opinion, "[t]he important questions . . . are whether the applicant's actions were 'directed toward a governing institution, or only against individuals whose corruption was aberrational,'" and "whether the persecutor was attempting to suppress a challenge to the governing institution, as opposed to isolated, aberrational acts of greed or malfeasance." Id. at 548, quoting Mamouzian v. Ashcroft, 390 F.3d 1129, 1135 (9th Cir. 2004). Answering these questions necessarily involves a "complex and contextual factual inquiry" into the nature of the asylum applicant's activities in relation to the political context in which the dispute took place. Id.

Here, Rodas presented substantial evidence supporting his contention that his reporting of official corruption was inherently political when viewed in the context of the political shift that took place in 2000 when President Portillo assumed power and the ruling regime became antithetical to the ideals and goals of the Peace Accords. Whereas President Arzú led the country out of civil war and strove for adherence to the rule of law, Rodas argues, the new regime revived many of the corrupt aspects of the pre-Peace

15

Accords era. This version of events is supported by the testimony of Enriquez, a former political leader in Guatemala, who served, among other capacities, in President Arzú's office and assisted with the implementation of the Peace Accords. According to Enriquez, "[w]hen the PAN was in power, they dissolved the old police, removed a lot of corrupt elements and personnel and created the new PNC." However, there were nevertheless "strong elements in the Guatemalan Government and particularly the Army that were opposed to the peace process," and, as a member of Arzú's administration, Enriquez "experienced first hand the resistance within the Army and related security forces to truly carrying out the accords." Enriquez also recounts that things became much worse in 2000, when President Portillo and the FRG replaced President Arzú and the PAN. According to Enriquez, as the FRG is "a party of the right run by the former General Rios Montt [a former military dictator] and associated with the security forces," under President Portillo's leadership, "[p]olice and military officials who had been dismissed for violations of human rights and/or criminal activity regained their positions. The majority of these people are members of the FRG."

Beyond Rodas's and Enriquez's accounts, the record is replete with evidence documenting substantial and pervasive corruption in the PNC and the Guatemalan government more broadly. The 2005 State Department Country Report on Human Rights Practices in Guatemala, included as part of Rodas's asylum application, reports that "[c]orruption and substantial inadequacies in the police and judicial sectors . . .

16

continue[]" with "unlawful killings committed by members of the security forces." U.S. Dep't of State, 2005 Country Report on Human Rights Practices: Guatemala (Mar. 8, 2006), available at http://www.state.gov/g/drl/rls/hrrpt/2005/61729.htm. The 2004 State Department Country Report likewise indicates that "[p]olice corruption was a problem, and there were credible allegations of involvement by individual police officers in criminal activity." U.S. Dep't of State, 2004 Country Report on Human Rights Practices: Guatemala (Feb. 28, 2005), available at http://www.state.gov/g/drl/rls/hrrpt/2004/41762.htm.[3]

Corruption related to drug trafficking is a particular problem – so much so that in October 2002, the United States Congress held hearings on the topic of "Drug Corruption and Other Threats to Democratic Stability in the Dominican Republic and Guatemala." *Drug Corruption and Other Threats to Democratic Stability in the Dom. Rep. and Guat.: Hearing Before the H. Subcomm. on the W. Hemisphere of the Comm. on Int'l Relations*, 107th Congress 50-51 (2002), hearing transcript available at http://commdocs.house.gov/committees/intlrel/hfa82262.000/hfa82262_0f.htm. At those

---

[3] The State Department's Reports on Guatemala for 2001 through 2003, not included in the administrative record, note similar problems. See U.S. Dep't of State, 2003 Country Report on Human Rights Practices: Guatemala (Feb. 25, 2004) ("Corruption, especially drug-related, was widespread."), available at http://www.state.gov/g/drl/rls/hrrpt/2003/27900.htm; U.S. Dep't of State, 2002 Country Report on Human Rights Practices: Guatemala (Mar. 31, 2003), available at http://www.state.gov/g/drl/rls/hrrpt/2002/18333.htm; U.S. Dep't of State, 2001 Country Report on Human Rights Practices: Guatemala (Mar. 4, 2002), available at http://www.state.gov/g/drl/rls/hrrpt/2001/wha/8344.htm.

hearings, Paul E. Simons of the State Department testified that "[w]idespread corruption . . . ha[s] plagued counternarcotics efforts in Guatemala during the last three years," to such an extent that "[a] week does not go by without another corruption scandal involving government officials." Id. at 50-51 (statement of Paul E. Simons, Acting Assistant Secretary of State for Int'l Narcotics and Law Enforcement). Simons further testified that corruption persists "at all levels of the system," and noted that many implicated in corruption have close ties to President Portillo. Id. at 51-52. A 2003 report of the United States Drug Enforcement Administration notes that "Guatemalan law enforcement officials profited from stolen drug loads; offered protection for traffickers . . . ; stole money from suspects; assassinated drug transporters for the purposes of stealing their shipments; tortured and killed innocent civilians; and committed a variety of other criminal acts." DEA Drug Intelligence Brief 6. In September 2006, the former head of Guatemala's drug enforcement agency and his top deputy pled guilty to conspiring to smuggle cocaine into the United States. Eric M. Weiss, Former Guatemalan Agency Chiefs Guilty in Drug Plot, Wash. Post, Sept. 8, 2004, at A4. Additional examples abound, but these alone provide ample evidence of an endemic problem with corruption in Guatemala and support Rodas's contention that by opposing such corruption, he was in essence opposing the regime of President Portillo and, more generally, those who sought to thwart the development of a stable rule-of-law democracy in Guatemala.

The IJ, however, failed to consider Rodas's claim in this context. Instead of

18

evaluating the claim against the backdrop of Guatemala's volatile political history, the IJ short-circuited the analysis and dismissed Rodas's claim of political persecution by presuming that Rodas was targeted for his resistance to being recruited by the corrupt officers, which the IJ believed to lack any political dimension, and for reporting the crimes of rogue police officers, which the IJ considered an occupational hazard of Rodas's job and thus again non-political. Both strands of that analysis are flawed.

The IJ did not clearly articulate her grounds for finding that Rodas was the target of a recruitment effort. Presumably, the IJ was influenced by the fact that Rodas was assigned to investigate drug trafficking by the same officer who he later witnessed engaging in a drug deal and the reference by one of the thugs sent to attack Rodas while he was on guard at the hospital to Rodas's refusal to join them. While such facts might arguably point towards such an inference were they standing on their own, the IJ's recruitment finding is not supported by substantial evidence when viewed in light of the record as a whole. Indeed, the government makes no genuine effort to defend this finding, simply mechanically asserting, without elaboration, that it is supported by substantial evidence. Rodas's supervisors, Revolorio and Navas, made no attempt to recruit Rodas when he came upon them consorting with the drug dealer but rather pretended that they were engaged in official business and sent Rodas on his way. Nor was any active recruitment effort made at any point thereafter. Moreover, there is no evidence that Rodas's partner, who also witnessed Revolorio's and Navas's drug

19

transaction but, unlike Rodas, did not denounce the corruption to MINUGUA, suffered any adverse consequences; indeed, he continued to serve as a member of the PNC following this incident, while Rodas had to flee for his life. There is similarly no evidence that Rodas's partner joined in any corrupt activities, beyond simply failing to report on the corruption of others.

Certainly, this case is unlike Elias-Zacarias, upon which the IJ relied in ruling that the purported recruitment of Rodas lacked a political component. In Elias-Zacarias, the asylum applicant left his country (incidentally, Guatemala) to avoid being drafted into a guerilla army, an undesirable fate visited on him because the guerillas needed soldiers and not necessarily because of his opposition to their political views. 502 U.S. at 480, 482-83. The Supreme Court rejected Elias-Zacarias's claim of political persecution, holding that "the mere existence of a generalized 'political' motive underlying the guerrillas' forced recruitment," without more, did not amount to persecution "on account" of a political opinion. Id. at 482. The Court noted that there were a variety of possible reasons that even one who supported the guerillas' cause may resist joining the rebel army. Id. Moreover, Elias-Zacarias himself testified that he resisted recruitment not because he opposed the guerillas' politics, but because he feared retaliation by the government if he joined. Id. Accordingly, the Court held that the evidence did not compel the conclusion that Elias-Zacarias was expressing a political opinion in resisting recruitment, nor that the guerillas would necessarily have believed his resistance to be the

20

expression of a hostile political view. Id. Here, by contrast, according to Rodas's testimony – which was credited by the IJ – Rodas was actively opposed to corruption and was targeted for retaliation because he took affirmative action to quell such activity.

Additionally, even if recruitment were *one* reason for Rodas's persecution, that would not be conclusive, for Rodas need show only that his political opinion, actual or imputed, was "one central reason" for his persecution, not that it was the sole reason for it. Thus, "careful attention to the particular circumstances surrounding the alleged persecution remains necessary even if the persecution is generally categorized as extortion or recruitment." Marroquin-Ochoma v. Holder, 574 F.3d 574, 577 (8th Cir. 2009), quoting De Brenner v. Ashcroft, 388 F.3d 629, 638 n.2 (8th Cir. 2004). As we have repeatedly recognized, persecutors may have "mixed motives," and an asylum applicant need not demonstrate that a protected ground was the exclusive reason for persecution, for "[t]he plain meaning of the phrase 'persecution on account of the victim's political opinion,' does not mean persecution *solely* on account of the victim's political opinion." Osorio, 18 F.3d at 1028; accord, Aliyev v. Mukasey, 549 F.3d 111, 116 (2d Cir. 2008).

This Circuit has yet to consider how the REAL ID Act's "one central reason" standard – requiring an asylum applicant to demonstrate not only that his persecution is "on account of" a protected ground, but more strictly that the protected ground is "one central reason" for the persecution – impacts the mixed motive analysis. On its face

21

however, the language employed makes clear that mixed motives asylum claims continue to be viable, and the BIA has so held. In re J-B-N- & S-M-, 24 I. & N. Dec. 208, 212 (BIA 2007). Specifically, in interpreting this phrase, the BIA has noted that the use of the term "one central reason" "confirms that aliens whose persecutors were motivated by more than one reason continue to be protected . . . if they can show a nexus to a protected ground." Id. at 213.

Rodas does not claim that he left Guatemala because he did not want to be a corrupt police officer and his superiors sought to corrupt him. Rather, Rodas claims that he fled Guatemala because the PNC agents were trying to kill him for blowing the whistle on their corruption. Accordingly, even if the IJ had been correct in concluding that Revolorio and Navas targeted Rodas in part because he rejected their recruitment efforts, Rodas could still prevail by demonstrating that one central reason for his persecution was an action that reflected, or was perceived by his persecutors to reflect, a political opinion.

Here, there is considerable evidence that whatever else may have also motivated Rodas's superiors, he was targeted because he undertook the independent step of blowing the whistle on the senior PNC officers' corrupt activities. Substantial record evidence supports the conclusion that in the Guatemalan context at the time of these events, Rodas's actions reflected, or would likely be perceived to reflect, political opposition to the governing regime. As recounted in detail above, Rodas introduced evidence documenting pervasive corruption during that period and direct ties between corrupt

22

elements and President Portillo and his regime, which was affiliated with a former military dictator. Moreover, Rodas's particular actions had a political cast: by reporting his allegation not merely to police officials but to a United Nations watchdog agency created as part of a political accord between rival factions and designed to support human rights and the rule of law, Rodas could well have been perceived as striking a political blow against the Guatemalan government. Indeed, Enriquez posits that "the FRG and those who re-entered the authorities after its victory would have identified [Rodas] with the PAN" and "would have seen a PNC agent such as [Rodas] as a problem. . . . especially since he had witnessed acts of corruption and had spoken to the Human Rights Office."

The IJ recognized this aspect of Rodas's claim; however, she denied that the retaliation against Rodas contained a political component, finding that, as a member of the PNC, Rodas voluntarily assumed the risks of harm that followed from reporting a crime committed by "rogue police officers." There are two interrelated flaws in the IJ's reasoning.

First, substantial evidence does not support the IJ's finding that Rodas's persecutors were rogue police officers, rather than representatives of a regime characterized by endemic, systemic corruption. Although in granting Rodas and Carranza relief under the CAT, the IJ recognized Guatemala's substantial problems with police corruption, the IJ does not appear to have considered any of this extensive evidence in

23

deeming those out to get Rodas "rogue" forces, nor did the IJ provide any reasoning to support this bald conclusion. In light of the evidence detailing the widespread problems with corruption plaguing Guatemala, the IJ's cursory finding that Rodas's persecutors were merely "rogue" police officers cannot stand. See, e.g., Passi v. Mukasey, 535 F.3d 98, 101 (2d Cir. 2008) ("We will . . . vacate and remand for new findings if the agency's reasoning or its factfinding process was sufficiently flawed, for example, where the agency's determination was based on an inaccurate perception of the record, omitting potentially significant facts.") (internal quotation marks omitted).

Second, compounding this error, the IJ also endorsed the erroneous view that Rodas's position as a member of the PNC inherently refutes the conclusion that, in reporting governmental corruption, he was expressing a political opinion. In reaching this conclusion, the IJ relied on Matter of Fuentes, where the BIA found "that dangers faced by policemen as a result of that status alone are not ones faced on account of . . . political opinion" or any other protected ground. 19 I. & N. Dec. at 661. In Fuentes, a former member of the El Salvadoran police force claimed that he would be persecuted by guerillas if he returned to El Salvador. Id. at 659. The BIA rejected the argument that such harms would constitute political persecution, noting that police officers "are often attacked either because they are (or are viewed as) extensions of the government's military . . . or simply because they are highly visible embodiments of the power of the state," and that "[s]uch dangers are perils arising from the nature of their employment and

24

domestic unrest rather than 'on account of' immutable characteristics or beliefs within the scope of [the INA]." Id. at 661.

Rodas's situation is quite distinct from this paradigm. He argues not that he is being targeted for being an agent of the state but – because the state is corrupt – for opposing the state. Rodas thus "does not fear the usual job hazards of a law enforcement officer; his alleged tormentors are not mere criminals or guerilla forces. Rather, he claims they are instruments of the government itself." Grava, 205 F.3d at 1181-82. Accordingly, Rodas's "position as a law enforcement officer does not per se disqualify him from asylum." Id. at 1181.

Moreover, Rodas's actions unquestionably went beyond those of an ordinary policeman reporting a crime. As noted above, in addition to simply reporting the incident within the PNC's chain of command, Rodas denounced the corruption he observed to an external international human rights organization set up as part of a political process. This action alone removes the dangers Rodas faced from the ambit of mere occupational hazards of police duty.[4] See Haxhiu v. Mukasey, 519 F.3d 685, 690-91 (7th Cir. 2008) ("Haxhiu's military duties are no obstacle to his asylum claim because his anticorruption activities persisted beyond his employment with the Albanian Army. He approached the press after his termination – and suffered persecution for doing so.") (internal citation

---

[4] Moreover, Rodas further implicated that organization by bringing representatives of it along to protect him when he went to the police station to review the proposed resignation papers.

25

omitted); cf. Pavlyk v. Gonzales, 469 F.3d 1082, 1089 (7th Cir. 2006) (rejecting purported whistle blower's claim of political persecution because "in his investigation into corruption [petitioner] did not take [his evidence of corruption] to the public in quest of a political decision" but "[i]nstead, [he] pursued an investigation within his role as a prosecutor") (internal quotation marks omitted; second brackets in original).  As a result, the IJ erroneously relied on Matter of Fuentes in finding that Rodas's had, in joining the police force, voluntarily assumed the risk of being subjected to death threats by senior police officials and having his brother murdered.

The IJ's combined legal and factual errors in considering Rodas's claim of political persecution require us to remand.  The IJ treated Rodas's claim as if he were simply an ordinary policeman targeted by criminals for taking routine law enforcement activities against isolated corrupt police officers in a system otherwise manifesting adherence to the rule of law.  If that were the reality underlying Rodas's claims, then the IJ would have been correct to dismiss the claim of political persecution.  But in reaching that result, the IJ ignored substantial evidence to the contrary and in doing so fundamentally erred.  The government argues that simply having an affinity for the rule of law and being against corruption is not a political opinion.  While that may be true in a stable country governed by the rule of law, in certain contexts, opposition to endemic corruption is precisely a political opinion, and retaliation for expressing such an opinion may constitute political persecution.

26

Rodas's case exemplifies why a claim of political persecution cannot be evaluated in a vacuum, as it was here, without reference to the relevant circumstances in which the claim arises. We have repeatedly emphasized the fallacy of this approach and have on several occasions remanded cases in which the agency denied an application for asylum based on its failure to properly engage in the "complex and contextual factual inquiry" that such claims often require. Yueqing Zhang, 426 F.3d at 548; see also Vumi v. Gonzales, 502 F.3d 150, 157 (2d Cir. 2007) (faulting the BIA for failing to consider the "potentially deeply political nature of Vumi's persecution"); Osorio, 18 F.3d at 1030 (characterizing the BIA's decision as "reveal[ing] a complete lack of understanding of the political dynamics in Guatemala" and faulting the BIA for "intentionally ignor[ing] the underlying political context of the dispute"). Nevertheless, in this case, the agency has once again embraced an "impoverished view of what political opinions are, especially in a country . . . where certain democratic rights have only a tenuous hold," Yueqing Zhang, 426 F.3d at 546 (omission in original), quoting Osorio, 18 F.3d at 1030, by rejecting Rodas's claim without any coherent examination of the surrounding political environment.

To properly evaluate Rodas's claim, a careful consideration of the broader political context is necessary to ascertain "whether [his] actions were directed toward a governing institution, or only against individuals whose corruption was aberrational," and "whether the persecutor[s] [were] attempting to suppress a challenge to the governing institution, as

opposed to a challenge to isolated, aberrational acts of greed or malfeasance." Yueqing Zhang, 426 F.3d at 548 (internal quotation marks omitted). Here, "[b]ecause the IJ did not undertake this inquiry, the appropriate course is to grant the petition for review and remand the case to the agency for consideration in the first instance of whether [Rodas] made the requisite showing." Id. at 548-49; see also Manzur, 494 F.3d at 294. As the Supreme Court has reminded us, "the law entrusts the agency to make the basic asylum eligibility decision. . . . In such circumstances a judicial judgment cannot be made to do service for an administrative judgment." I.N.S. v. Orlando Ventura, 537 U.S. 12, 16 (2002) (internal citations and quotation marks omitted). Here, however, the agency failed to make this decision, instead avoiding it by erroneously excluding Rodas from within the ambit of asylum protection by the agency's recruitment and police officer theories.[5]

**CONCLUSION**

For the foregoing reasons, the petition for review is granted and the case is remanded to the BIA – "or [to] the IJ, if that is the most appropriate decision-maker in the

---

[5] Rodas's alternative argument that he qualifies for asylum based on his membership in the social group defined as Guatemalan police officers who have registered complaints against official corruption essentially overlaps with the political opinion claim. To the extent there is any reality to the assumption that whistle blowing police officers are perceived as a distinct social group with the requisite social visibility, what identifies that group would be precisely the imputed political opposition to the regime discussed above. That determination requires the same contextual evaluation of the relevant circumstances as is necessary for the claim of political persecution. As the BIA has noted, "[w]hether a proposed group has . . . the requisite 'social visibility' must be considered in the context of the country of concern and the persecution feared." In re A-M-E & J-G-U-, 24 I. & N. Dec. 69, 74 (BIA 2007).

28

first instance," <u>Mahmood v. Holder</u>, 570 F.3d 466, 471 (2d Cir. 2009) – for further proceedings consistent with this opinion.